**NATIONAL TREASURY EMPLOYEES UNION, Appellant,**

**v.**

**Alan K. CAMPBELL, Chairman, United States Civil Service Commission, et al.**

**No. 77–1808.**

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1978.

Decided Nov. 14, 1978.

Robert M. Tobias, Washington, D. C., for appellant.

Eloise E. Davies, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., Washington, D. C., and Earl J. Silbert, U. S. Atty., Washington, D. C., were on the brief, for appellee.

Before WRIGHT, Chief Judge, and BAZELON and MacKINNON, Circuit Judges.

Opinion for the court filed by Chief Judge J. SKELLY WRIGHT.

J. SKELLY WRIGHT, Chief Judge:

This appeal is from the District Court's disposition of a complaint challenging the rates negotiated by the United States Civil Service Commission for federal employees' Blue Cross-Blue Shield health insurance. Plaintiff-appellant, the National Treasury Employees Union (NTEU), seeks a damage award to those it represents, an order requiring the Commission to follow certain accounting and reporting practices set forth in various procurement regulations, and other appropriate relief. The District Court dismissed two counts for want of jurisdiction and granted summary judgment for the defendants-appellees on the remaining two. For the reasons set forth below, we reverse and remand on all issues save one, as to which we affirm summary judgment.

I

Since 1960 federal employees have been able to choose among a variety of health insurance options made available under the auspices of the Federal Employees Health Benefits Act, 5 U.S.C. § 8901 et seq. (1976).[1] The costs of the various plans are borne in part by the Government and in part by the employees through payroll deductions. 5 U.S.C. § 8906. The Act gives the Civil Service Commission authority to contract with qualified insurance carriers to provide various types of health insurance plans, 5 U.S.C. § 8902(a), and states: "Rates charged under health benefits plans * * shall reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i) (emphasis added). In addition, rates for health benefit plans classified either as Service Benefit Plans or Indemnity Benefit Plans are to be "determined on a basis which, in the judgment of the Commission, is consistent with the lowest schedule of basic rates generally charged for new group health benefit plans issued to large employers." Id. See also 5 U.S.C. §§ 8903 and 8904. In subsequent years, rates for these kinds of plans may, under the statute, be readjusted "on a basis which, in the judgment of the Commission, is consistent with the general practice of carriers which issue group health benefit plans to large employers." 5 U.S.C. § 8902(i). Blue Cross-Blue Shield is a Service Benefit Plan.

The 1976 rate negotiations for federal employees' Blue Cross-Blue Shield coverage, which are the primary target of the instant litigation, began in mid-1975 when Blue Cross-Blue Shield submitted a proposed rate increase of 38.4 percent—an amount that was intended both to compensate for a shortfall in revenues the preceding year and to meet demands for services in 1976. Joint Appendix (JA) 101–102. This figure was subsequently revised downward to 35.3 percent, JA 110, and an increase of that amount was agreed to.

On December 30, 1975 NTEU filed suit in the District Court challenging this rate increase. On the basis of studies and analyses somewhat critical of the 35.3 percent figure,[2] NTEU's complaint alleged in Count

1. The Act, which was adopted September 28, 1959, 73 Stat. 708, was previously codified at 5 U.S.C. § 3001 et seq.

2. Specifically, the NTEU complaint referred to: (1) "An actuarial analysis conducted by an actuary employed by the [Commission]" which purportedly stated that a rate increase ranging from 26.5% to 31.9% would be justifiable. JA 6. The Commission, through the affidavit of a chief actuary, denies any knowledge of an analysis which arrived at this conclusion. JA 25. (2) A study by the Federal Insurance Administration concluding that a 17.4% increase would be the "lower boundary" of a justifiable rate increase. JA 112–113. (3) A General Accounting Office report noting a computational error in the actuarial analysis performed by

672

that the 1976 rates were unreasonably high, and thus that the Commission had failed to discharge its statutory duty to negotiate rates which "reasonably and equitably reflect the cost of the benefits provided." 5 U.S.C. § 8902(i). JA 5–7. In the same vein, the complaint alleged in Count 4 that a so-called "public service charge" included in the rate was unreasonable.[3] JA 10–11. Count 2 challenged the Civil Service Commission's failure to apply various Federal Procurement Regulations to the 1976 rate negotiation process. JA 7–10. And Count 3 challenged the Commission's failure to use the same regulations in the course of negotiations concerning the 1977 rates. JA 10. The complaint sought an order requiring the United States to pay damages to each federal employee in the amount of the overcharge allegedly paid by him or her for health insurance, declaratory and injunctive relief relating to the procurement regulations, and such other relief as the court deemed proper. JA 11–12.[4]

Defendants—the United States and various Civil Service Commission officials—moved for dismissal on jurisdictional grounds and, in the alternative, for summary judgment. The District Judge dismissed Counts 1 and 4—relating to the actual rates negotiated—for want of jurisdiction. JA 17–20. Turning to Counts 2 and 3, the judge noted that the defendants had supplied affidavits to the effect that they were "in compliance with the applicable [procurement regulations]" and that plaintiffs had submitted no counter-affidavits. JA 21. In consequence, he granted summary judgment.

II

We deal first with the proper disposition of Counts 1 and 4. The District Court was of the opinion that it lacked subject matter jurisdiction over the issues raised in these counts. We disagree. In our judgment, the court adopted too parsimonious a view of the jurisdictional grant which Congress included when it adopted the Federal Em-

the Commission. The chief actuary's affidavit referred to supra acknowledges this error but denies that it had any impact on the ultimate conclusion that the 35.3% rate increase was reasonable. JA 25. Citing GAO materials, NTEU asserts before this court that this error led the Commission to overstate the needed rate increase by 5–7%. Brief for appellant at 6–7.

3. This "public service charge" amounted to $3.3 million in the 1976 contract. See Article X, § (a)(3)(C) of that contract, JA 45. A variety of less than consistent explanations for the charge are set forth in appellees' brief at 36–38.

4. The standing of NTEU to bring the instant suit has not directly been challenged in this court. We note, however, that there appears to be no standing obstacle. In the first place, there is no doubt that if the Commission has actually failed to negotiate rates that reasonably and equitably reflect costs, federal employees like members of the plaintiff union would suffer "injury in fact." Further, that injury seems clearly to be within the zone of interests protected by the requirement of § 8902(i) that rates "reasonably and equitably reflect the cost of the benefits provided." See Ass'n of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 155–156, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970). Indeed, it is difficult to imagine anyone other than federal employees suing to enforce that standard. Cer-

tainly health insurance providers have little incentive to do so. If they believe that rates offered by the Commission are too low, their recourse is not to sign the contract, and it is unlikely that they will assert the rates are too high.

Having established that individual federal employees have standing, it remains only to ensure that NTEU has standing derivatively as a representative of those employees. NTEU is the principal union within the Department of the Treasury and has been designated as the exclusive representative of approximately 90,-000 federal employees. JA 241. We see no reason to think the union lacks standing to represent those employees in this suit. The Supreme Court has stated that "an organization whose members are injured may represent those members in a proceeding for judicial review." Sierra Club v. Morton, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972). See also id. at n.14; NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963); United Federation of Postal Clerks v. Watson, 133 U.S.App.D.C. 176, 183–185, 409 F.2d 462, 469–471, cert. denied, 396 U.S. 902, 90 S.Ct. 212, 24 L.Ed.2d 178 (1969) (postal union has standing). In sum, we conclude that individual employees would have standing to bring the present suit and that NTEU has standing to do so on behalf of those it represents.

ployees Health Benefits Act and, by collapsing into the rubric of jurisdiction a number of analytically distinct questions, failed to realize that Congress had left some play for judicial review.

### A.

At the outset, we note that there are two potential jurisdictional difficulties posed by the NTEU complaint. The first has to do with the ever complex problem of sovereign immunity and the second with the amount in controversy. Either might have rendered the general grant of federal question jurisdiction in 28 U.S.C. § 1331(a) (1976) unavailable as a vehicle for the present suit.[5] In our judgment, however, resort to Section 1331(a) is unnecessary because the jurisdictional provision within the Health Benefits Act itself—5 U.S.C. § 8912—expressly resolves both problems by waiving sovereign immunity and granting jurisdiction to the District Courts regardless of amount in controversy. Because this general area is not free from difficulty—and

because of the confusion that inheres in the use of the term "jurisdiction" to denote both the broad rules regarding the subject matters cognizable in federal court and the specific issues that arise under the rubric of sovereign immunity[6]—we set forth our analysis at some length.[7]

The key question is the scope of Congress' consent to suit in 5 U.S.C. § 8912. That section provides:

> The district courts of the United States have original jurisdiction, concurrent with the Court of Claims, of a civil action or claim against the United States founded on this chapter [Chapter 89 of Title 5, which is the Health Benefits Act as currently codified].

The District Court was of the opinion that, because the jurisdiction of the Court of Claims was "expressly referenced," "the intent of the drafters [was] that the jurisdiction conferred upon the district courts be for the same types of actions under the Act as are properly brought in the Court of Claims." JA 19. Reasoning that the in-

---

5. In its present form 28 U.S.C. § 1331(a) does not require any jurisdictional amount in suits against the United States or its instrumentalities and officers. The legislation eliminating the $10,000 requirement for such suits, which was enacted in 1976, is discussed at notes 7 and 19 and 191 U.S.App.D.C. at ——–——, 589 F.2d at 676–677 *infra*.

6. Statutes consenting to suit against the United States, for example, are generally phrased in jurisdictional terms. *See, e. g.,* 28 U.S.C. § 1346(b) (1976) (Federal Tort Claims Act); 28 U.S.C. § 1347 (1976) (jurisdiction over actions to partition lands). For an exception, *see* Public Vessels Act, 46 U.S.C. § 781 *et seq.* (1970) (couching waiver of sovereign immunity in terms of permission to sue the United States). *See generally* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 1326–1331 (2d ed. 1973).

7. In view of our conclusion that 5 U.S.C. § 8912 applies to the present suit, we have no occasion to reach a number of other possible grounds for finding consent to suit and jurisdiction. Those grounds include: (1) The common law "fiction" that a suit against officials acting beyond the scope of their authority is not a suit against the sovereign. *See generally Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). *But see Dugan v. Rank,* 372 U.S. 609, 620–623, 89 S.Ct. 999, 10 L.Ed.2d 15 (1963); *Larson v. Do-*

*mestic & Foreign Commerce Corp.,* 337 U.S. 682, 687, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). (2) The federal mandamus statute, 28 U.S.C. § 1361 (1976). (3) A combination of general federal question jurisdiction under 28 U.S.C. § 1331(a) and the waiver of sovereign immunity contained in §§ 10(a) and 10(b) of the Administrative Procedure Act, 5 U.S.C. §§ 702 & 703 (1976). There is no question that a suit for other than money damages could be brought in this manner today. The 1976 amendments to 28 U.S.C. § 1331(a) eliminate the jurisdictional amount requirement in actions "brought against the United States, any agency thereof, or any officer or employee thereof in his official capacity." Pub.L. No. 94–574, 90 Stat. 2721 (Oct. 21, 1976). And the language added by the same legislation to 5 U.S.C. §§ 702 & 703 eliminates any sovereign immunity problems with regard to such a suit. The difficulties posed by the actual NTEU complaint under §§ 1331(a), 702, and 703 would be twofold. First, these sections would not cover the damage claim. *See* 5 U.S.C. § 702. Second would be a problem of timing: The union's complaint was filed some ten months before the relevant statutory amendments were adopted. We have no occasion, in light of our disposition of the present case, to focus on this issue, although it seems— at least with regard to § 1331(a)—not to be a major problem. *See* note 19 *infra*.

674

stant suit is "fundamentally a challenge to the practices of the Commissioners of the Civil Service Commission" which raised matters that "should be left to the expertise and judgment of the * * * Commission," the court concluded that appellant's joinder of the United States had been a "*pro forma*" effort to get within Section 8912, that Counts 1 and 4 could not have been brought in the Court of Claims, and therefore that Section 8912 was not "an appropriate basis for jurisdiction."[8]   JA 19–20.

■ In our judgment, the scope of Section 8912 is not so limited.  The statutory grant of jurisdiction by its terms unmistakably covers all civil actions against the United States that are "founded on this chapter."  It is thus a broad consent to all suits brought to enforce rights and obligations created by the Health Benefits Act. We find no merit in the contention that the inclusion of a reference to the Court of Claims was a backhanded way of limiting and distorting this broad jurisdictional grant.  To so conclude would require us to ignore the plain meaning of the words that Congress chose.  Rather, it seems to us more likely that the reference to the Court of Claims was intended ,simply to make clear that that forum too is available to hear suits founded on Chapter 89.

Our conclusion in this regard closely parallels that reached by this court in 1962 when construing the nearly identical language of the jurisdictional grant in the Federal Employees Group Life Insurance

Act of 1954.  *See Barnes v. United States*, 113 U.S.App.D.C. 318, 320–321, 307 F.2d 655, 657–658 (1962).[9]  The words we used there might with equal confidence be used here:

[T]he District Courts were granted jurisdiction over civil actions or claims "founded upon" the Act.  The United States has consented to be sued, we conclude, to the extent that any such civil action or claim can be shown to involve some right created by this Act and a breach by the Government of some duty with respect thereto.

*Id.*[10]

The determination that Section 8912 extends beyond those sorts of civil actions that might otherwise have been brought in the Court of Claims does not conclude our jurisdictional inquiry.  For we still must ensure that the NTEU complaint in fact falls within that section.  This requires a more careful exploration of the general scope of Congress' consent to suit and a brief look at the import of the "against the United States" language in Section 8912.

The scope of consent problem can be approached in two fairly distinct ways.  The first tends to expand and prolong the jurisdictional inquiry.  Under it, we would begin by noting that jurisdiction depends upon congressional consent to suit and that Congress has, via Section 8912, consented to suits to vindicate rights or enforce obligations created by the Federal Employees Health Benefits Act.  Accordingly, the question of jurisdiction could be seen to

**8.** The District Court also rejected plaintiff's arguments that jurisdiction was proper under the mandamus statute, 28 U.S.C. § 1361 (1976), and the Declaratory Judgment Act, 28 U.S.C. § 2201 (1976).  JA 17–20.

**9.** *See also McDade v. Hampton*, 152 U.S.App. D.C. 131, 469 F.2d 142 (1972) (finding jurisdiction under grant in Group Life Insurance Act without discussion).  The present jurisdictional grant in the Group Life Insurance Act, 5 U.S.C. § 8715 (1976), states:

The district courts of the United States have original jurisdiction, concurrent with the Court of Claims, of a civil action or claim against the United States founded on this chapter.

**10.** Relying in part on this decision, the Fifth Circuit, in *Shannon v. United States*, 417 F.2d 256 (5th Cir. 1969), adopted a similar interpretation of the jurisdictional grant in the Servicemen's Group Life Insurance Act, 38 U.S.C. § 765 *et seq.* (1976).  That grant states: "The district courts of the United States shall have original jurisdiction of any civil action or claim against the United States founded upon this subchapter."  38 U.S.C. § 775.

Interestingly, on the basis of the *Barnes* case, counsel for defendants-appellees in the present litigation essentially conceded at oral argument that the District Court had erred in its jurisdictional holding.

turn upon whether the particular rights and duties asserted by NTEU were actually created by the Act.[11] Unless the claim were patently frivolous, this line of reasoning would force us to undertake a rather detailed inquiry into the scope and content of the rights and duties Congress created. Were we to conclude at the close of such an inquiry that plaintiffs had failed to state a valid claim, we could couch that result as a dismissal for want of jurisdiction. *See Barnes v. United States, supra,* 113 U.S. App.D.C. at 421–422, 307 F.2d at 659–660 (Burger, J., concurring). On the other hand, were we to find that Congress *had* created the asserted rights or duties, we would be in the slightly curious position of having reached, and perhaps decided, the merits without ever having had an opportunity explicitly to declare our jurisdiction.

The second approach tends to foreshorten the jurisdictional inquiry by separating the consent to suit issue from the inquiry into the precise substantive rights and duties created by the Act. Under this approach, we would begin by making a threshold determination that the NTEU suit was "founded on" Chapter 89 of Title 5. This would not be a judgment on the merits. Rather, in a fashion analogous to that common in federal question cases, it would merely be a determination that the suit is nonfrivolous and arguably grounded on rights inferrable from the Act. If this were the case, we would proceed to inquire into the scope and nature of the specific rights and duties created and the asserted grounds of liability. The latter inquiry would not be undertaken under the rubric of sovereign immunity and consent to suit, and its outcome would not be stated in the language of jurisdiction. *See Barnes v. United States, supra,* 113 U.S.App.D.C. at 420–421, 307 F.2d at 658–659. *Cf. Bell v. Hood,* 327 U.S. 678, 681–683, 66 S.Ct. 773, 90 L.Ed. 939 (1946).[12]

From a practical standpoint, these two approaches are actually very close: where the "jurisdictional" problem turns on sovereign immunity grounds. With the fairly clear line drawn in *Bell v. Hood, supra,* and progeny, compare language in *United States v. Testan,* 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed. 114 (1976) (referring to jurisdiction of Court of Claims), and *Jackson v. Lynn,* 165 U.S.App. D.C. 172, 175-176, 506 F.2d 233, 236–237 (1974). In *Jackson* this court stated that "[f]or jurisdictional purposes it may suffice that a plaintiff is attempting to show that conduct of which he complains violates an Act of Congress. But to state a claim upon which relief may be granted his contention as to the meaning and reach of that Act must be legally correct." On the next page, however, we added that "the effort to imply a cause of action is impeded in this case because it requires a conclusion of waiver of sovereign immunity." The difficulty in the sovereign immunity area seems to stem largely from the superficial ungainliness of the notion that Congress has consented to some suits which turn out not to state a cause of action.

11. Carried to its logical extreme, this approach entirely collapses the merits into the jurisdictional inquiry via the notion of congressional intent. The result is something of a tautology—Congress is held only to have consented to suits in which plaintiffs seek relief which Congress would want them to receive. An analogous tautology in cases brought under the federal question jurisdiction was squarely rejected by the Supreme Court in *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946). There plaintiffs sought damages as a remedy for deprivation of Fourth and Fifth Amendment rights prior to the decision in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), which authorized some such relief. The lower courts dismissed for want of jurisdiction on the ground that the suit did not arise under the Constitution or laws of the United States for purposes of the predecessor of 28 U.S.C. § 1331(a) (1976). 327 U.S. at 680, 66 S.Ct. 773. The Supreme Court reversed, stating, "Jurisdiction * * * is not defeated[,] as respondents seem to contend, by the possibility that the averments might fail to state a cause of action on which petitioners could actually recover. For it is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." 327 U.S. at 682, 66 S.Ct. at 776. Concededly it may be somewhat more difficult to separate the question of jurisdiction from the validity of the cause of action and the underlying merits

12. *See also Director, Edward J. Meyer Mem. Hospital v. Stetz,* 433 F.Supp. 323, 326 (W.D. N.Y. 1977) (dismissing suit against United States charging failure to provide health benefits under Chapter 89 of Title 5 for failure to state a claim upon which relief may be granted, apparently after finding jurisdiction under § 8912).

They involve similar inquiries in similar sequences into similar problems. The differences are merely semantic. Notwithstanding this, however, we think there are grounds on which to favor the second approach. First, it comports somewhat better with the "founded on this chapter" language of Section 8912. Those words, like the phrase "wherein the matter * * * arises under the * * * laws * * * of the United States" in the general grant of federal question jurisdiction in 28 U.S.C. § 1331(a), seem clearly to demand something less than a showing that the claim is actually valid on the merits. *Bell v. Hood, supra.* Rather, they are satisfied where a suit in good faith asserts claims based upon and arguably supported by the statute. Second, this approach is considerably more tidy than the first one. Specifically, it avoids the need to make what may be a highly detailed exploration of the merits in order to determine whether there is jurisdiction to decide the merits. Third, it is somewhat more likely to promote clarity by preventing the collapse of all manner of issues into a single jurisdictional inquiry.[13]

▆ Under this second approach, we have no doubt that there exists jurisdiction over all issues raised by appellant. The NTEU complaint asserts that Section 8902(i)'s requirement that rates reasonably and equitably reflect costs imposes a duty on the Government and accords to federal employees a corresponding right. That claim can-

not be regarded as frivolous, and it is clearly within the words "founded on this chapter" which Congress used in Section 8912. The validity as a matter of law of the plaintiff's arguments, the content of the reasonable and equitable standard, the proper characterization of the facts in the present situation, and the appropriate relief, if any, are questions properly addressed at subsequent stages.[14]

Having determined that the claims raised are within the ambit of the congressional consent, the only remaining jurisdictional question is whether—as the District Court seems to have thought—the phrase "civil action or claim *against the United States*" in Section 8912 poses difficulties for some facet of the present suit. The potential problem is this: If the District Court was correct in disregarding the joinder of the United States and characterizing the present action as a suit against the Civil Service Commissioners and not the Government, JA 19–20, Section 8912 might be held not to apply. In that event, of course, there would be no sovereign immunity problem since the suit would, by hypothesis, have been held not to be one against the United States. But there could be amount in controversy difficulties since the suit would be remitted to the grant of federal question jurisdiction in 28 U.S.C. § 1331(a) which, until 1976,[15] contained a blanket $10,000 jurisdictional amount requirement

---

**13.** This second approach also comports better with the common usage of the term "jurisdiction" to denote a threshold question or inquiry capable of screening out those sorts of controversies upon which—because of historical, statutory, or constitutional constraints—the federal courts are not to act. To the extent that the jurisdictional determination cannot be made short of a decision on the merits, this screening function is undermined.

**14.** *Cf. Bell v. Hood, supra* note 11, 327 U.S. at 682, 66 S.Ct. 773. At the risk of being repetitive, this bifurcation of jurisdiction (or sovereign immunity) and merits does not in any way alter the sequence or content of analysis required to decide a case such as this. Rather, it provides new and arguably clearer ways of identifying and discussing the same issues. Thus it would not affect the outcome were we to couch our result as a remand to determine

whether Congress has "consented" to damages or declaratory relief in the present factual situation and thus whether there is "jurisdiction" to award either remedy. Nor, however, would it further the process of analysis. *Compare* 28 U.S.C. § 1361 (the mandamus statute) under which a determination on the merits is in effect required before the statute's applicability can be decided.

**15.** *See* Pub.L. No. 94–574, *supra* note 7 (adding language quoted in note 7 *supra*). The Supreme Court has made it clear that § 10 of the Administrative Procedure Act, 5 U.S.C. § 701 *et seq.* (1976), is not an independent grant of jurisdiction and thus does not provide a solution to the jurisdictional amount problem. *See Califano v. Sanders*, 430 U.S. 99, 104–107, 90 S.Ct. 980, 51 L.Ed.2d 192 (1977).

that the NTEU complaint may well be unable to satisfy under the rule prohibiting aggregation of claims.[16]

In our judgment, this entire problem is more imagined than real. First, we see no reason to disregard the actual parties and conclude that the NTEU complaint is not what it purports to be—a clearly non-frivolous claim against the United States.[17] Second, even if some portion of the complaint were regarded as not against the United States, the claim for damages is certainly one against the Government and thus within Section 8912. Jurisdiction over that claim would then, via a theory of pendent jurisdiction, permit the federal court to hear the balance of the complaint as well, regardless of jurisdictional amount.[18] Third, the amendments to Section 1331 eliminating the jurisdictional amount requirement for suits such as the present one

seem in any event to be retroactive and thus to confer jurisdiction over cases pending when the law went into effect.[19]

## B.

Blended in with the District Court's jurisdictional holding are suggestions that Commission decisions with regard to health insurance rates are not subject to judicial review because the issues raised would be too complex and the criteria to be applied too amorphous. "An examination of the Act," the District Judge stated, "reveals no standard of review upon which this Court might act * * *." JA 19. And later he observed that "the complex accounting and actuarial matters involved in setting insurance rates for federal employees should be left to the expertise and judgment of the Civil Service Commission." JA 20.[20]

**16.** That rule is set forth in *Snyder v. Harris,* 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969), and amplified in *Zahn v. International Paper Co.,* 414 U.S. 291, 94 S.Ct. 505, 38 L.Ed.2d 511 (1973). *See generally* C. Wright, Law of Federal Courts § 36 (3d ed. 1976), for a discussion of the rule and the major exception to it.

**17.** *Cf. Jones v. United States,* 407 F.Supp. 873, 876–877 (N.D. Tex. 1976) (noting that the United States "is at best an incidental party" to suit under life insurance provisions of Chapter 87 of Title 5, and yet finding jurisdiction under language in § 8715 nearly identical to that in § 8912).

**18.** *Cf. Hagans v. Levine,* 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974) (finding jurisdiction over statutory claim appended to constitutional claim brought under 28 U.S.C. § 1343(3) (1976)); *Rosado v. Wyman,* 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *Shannon v. United States, supra* note 10, 417 F.2d at 263 (finding pendent jurisdiction). Of course, the exercise of pendent jurisdiction is discretionary with the court. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**19.** *See Andrus v. Charlestone Stone Products Co.,* 436 U.S. 604, 607 n.6, 98 S.Ct. 2002, 56 L.Ed.2d 570 n.6 (1978) (finding jurisdiction under amended § 1331(a) where complaint was originally filed in 1973 and neither asserted § 1331(a) as basis of jurisdiction nor pleaded $10,000 in controversy). *See also Duke Power Co. v. Carolina Environmental Study Group,* 438 U.S. 59, 70 n.14, 98 S.Ct. 2629, 57 L.Ed.2d 595 n.14 (1978). This court has held

that the amendment to § 1331(a) does confer jurisdiction over at least those sorts of pending cases that might in the alternative be dismissed under the old version and refiled under the new. *See Ralpho v. Bell,* 186 U.S.App.D.C. 368, 376–377 n.51, 569 F.2d 607, 615–616 n.51 (1977). Several District Courts have found the 1976 amendments to be retroactive. *See First Nat'l Bank of Milaca v. Smith,* 445 F.Supp. 1117, 1119 (D. Minn. 1977); *Aldamuy v. Pirro,* 436 F.Supp. 1005, 1009–1010 (N.D. N.Y. 1977); *Green v. Philbrook,* 427 F.Supp. 834, 836 (D. Vt. 1977). *See also Texas Acorn v. Texas Area 5 Health Systems Agency, Inc.,* 559 F.2d 1019, 1022 (5th Cir. 1977) (impliedly).

**20.** The District Judge implicitly adopted the first approach to jurisdiction and sovereign immunity described in text. *See* 191 U.S.App. D.C. at ——————, 589 F.2d at 674, 675, *supra.* Accordingly, he saw questions of reviewability, agency discretion, and the suitability of the issues raised for judicial resolution not as separate from the jurisdictional inquiry, but rather as part and parcel of it. Certainly this has some appeal, if only because it suggests that whether Congress consented to a particular suit and whether it contemplated that the administrative action sued on could be reviewed by the judiciary seem to be similar questions. Yet they need not be identical. Indeed, as we have already observed, *see* 191 U.S. App.D.C. at ——, ——, 589 F.2d at 673–674, 675–676, *supra,* the language of § 8912 suggests that Congress gave a general consent to suits founded on Chapter 89 and expected the courts thereafter to perform their traditional function of hearing those suits, determining which raise

■ We have no quarrel with the proposition that the Commission has wide discretion to study and evaluate the "complex accounting and actuarial methods involved"; but we do not think it follows that the Commission has *carte blanche*. Congress did set certain limits, and chief among them is the requirement of Section 8902(i) that rates "reasonably and equitably reflect the cost of the benefits provided." Plaintiff here asserts that this mandate has not been followed. If so, the Commission has acted contrary to law. Nothing in the statute suggests that Congress intended to foreclose judicial intervention in such a situation. Further, there is in cases such as this a strong presumption of reviewability. *See Dunlop v. Bachowski*, 421 U.S. 560, 567, 95 S.Ct. 1851, 44 L.Ed.2d 377 (1975); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed. 136 (1971); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140–141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). We have been presented with nothing that overcomes this presumption in the present case. On the contrary, in the words of Section 10 of the Administrative Procedure Act, 5 U.S.C. § 701 (1976), we are persuaded that this statute does not "preclude judicial review" and that the Commission's action is not "committed to agency discretion by law." [21] 5 U.S.C. § 701(a). Rather, the Commission's discretion under the Health Benefits Act, though broad, is bounded by Section 8902(i);

and it is to the courts that the task of policing the boundary falls. That section provides the courts with "law to apply," *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 410, 91 S.Ct. 814 (*quoting* legislative history of the APA). We are aware of nothing that precludes their applying it.

## C.

The preceding conclusions with respect to jurisdiction and reviewability necessarily require that the District Court be reversed and the case remanded for further proceedings on Counts 1 and 4. It is for that court to determine whether the Commission has complied with the requirements of Section 8902(i), and we, of course, intimate no view on the matter. We do, however, wish to emphasize two points that may be important on remand.

■ The first is that the scope of review in a case such as this is quite narrow. As a result, while the District Court should undertake a "substantial inquiry," *Citizens to Preserve Overton Park, Inc. v. Volpe, supra*, 401 U.S. at 415, 91 S.Ct. 814, and require the Commission to explain how and on the basis of what data it determined that the rates it agreed to conformed with the statute, it is difficult to conceive of a situation in which the court would be justified in substituting its own judgment as to the

valid causes of action and which do not, and awarding relief where appropriate. Congress seems, in short, to have consented to suits which would permit the courts to determine the boundaries of agency discretion and the sorts of decisions which are and are not reviewable.

21. Appellant asserts that this is not an APA suit or, less explicitly, that the APA does not provide the *exclusive* means of challenging Commission actions. Presumably it does so in an effort to escape the rather narrow scope of review which § 10(e) of the APA, 5 U.S.C. § 706(2)(A) (1976), provides, and to keep alive its damage claim, which fits nowhere within the structure of the APA. While the enactment of a special jurisdictional grant in the Health Benefits Act—5 U.S.C. § 8912—provides some support for the proposition that Congress contemplated the possibility of some non-APA suits to remedy Commission abuses, the pres-

ence of that jurisdictional grant is not conclusive. Section 8912 was enacted at a time when (1) there was a blanket amount in controversy requirement in the grant of federal question jurisdiction and (2) the APA contained no express waiver of sovereign immunity. *See* note 7 *supra*. Thus it might be argued that § 8912 was just a way of ensuring that APA suits *could* be brought against the Commission. Still, the broad grant in § 8912 of jurisdiction over a "civil action or claim against the United States founded on this chapter" does not by its terms suggest that the APA totally occupies the sphere of judicial activity which Congress had in mind. The nature of any additional occupants, of course, is for the District Court to consider on remand. Under the rubric of reviewability, we have merely noted that the APA's exceptions to the presumption of reviewability do not apply to the present case.

proper rates for that of the commissioners so long as the latter is reasonably supported by the Commission's construction of the data and record. This is quite explicit if we assume, contrary to appellant's wishes,[22] that the present suit is one to which the Administrative Procedure Act applies. For in that event the scope of review would be governed by Section 706(2)(A) which states that a reviewing court shall hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A) (1976). Moreover, even if appellant is correct in its contention that the APA does not provide the exclusive route to review of the Commission's decision, the language of Section 8902(i) scarcely leaves room for more aggressive judicial intervention. Instead, it clearly contemplates a broad zone of administrative discretion and admits of a judicial override only where the Commission strays beyond that zone.

The second point we emphasize has to do with the question of relief. NTEU seeks damages in the amount of the excess rates supposedly paid by federal employees in 1976 as well as "such other and further relief as the Court may deem appropriate." JA 12. Whether the former can reasonably be inferred from the statutory scheme and what the latter might include are questions for the District Court to determine on remand if it concludes that the Commission has in fact acted in violation of Section 8902(i). It is important to stress at this stage, however, that nothing in our jurisdiction or reviewability holdings in any way leads to or even supports the conclusion that damages either were actually contemplated by Congress or flow logically from the structure or content of the statutory scheme. We have held only that a suit asserting rights arguably created by Chapter 89 and seeking their vindication is one "founded on" that chapter and hence within the rather broad consent to suit in Section 8912. It would in no way be inconsistent with that conclusion to determine subsequently that the particular relief sought is not available as a matter of sound statutory construction and inference. That Congress has consented to suit, in short, does not mean that it has validated every conceivable cause of action and claim for relief which counsel can construct.[23]

### III.

We turn now to the District Court's disposition of Counts 2 and 3 of the NTEU complaint, which relate to the Commission's alleged failure to apply Federal Procurement Regulations set forth in Chapter 1 of 41 C.F.R. to the health insurance rate negotiation and audit process. Defendants submitted an affidavit of one James L. Edwards, chief of the Program Review and Audits Office of the Civil Service Commission's Bureau of Retirement, Insurance and Occupational Health. That affidavit states in relevant part:

> Each of the 54 auditors assigned to the various Program Review and Audits staffs has in his possession as part of a policy and procedures manual, a copy of the Federal Procurement Regulations (41 CFR 1–15.2). The Federal Procurement Regulations are used in determining allowable and allocable administrative expenses charged by the various health benefit carriers.

JA 26. On the basis of this affidavit, the plaintiff's failure to submit a counter-affidavit, and Rule 56(e) of the Federal Rules of Civil Procedure,[24] the District Court concluded that summary judgment was proper as to Counts 2 and 3. JA 21.

---

**22.** *See* note 21 *supra.*

**23.** *See* note 20 *supra.*

**24.** Rule 56(e) states in pertinent part:
When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

In our judgment, this result was somewhat too sweeping. The Edwards affidavit refers specifically only to the procurement regulations in 41 C.F.R. § 1–15.2, relating to allowable administrative costs; and it states only that such regulations are used "in determining allowable and allocable administrative expenses  *  *  *." Thus it is sufficient to support summary judgment only as to one facet of NTEU's allegation that the Commission has failed to apply applicable procurement regulations— the facet relating to 41 C.F.R. § 1–15.2 and administrative costs.[25] As the briefs submitted to this court clearly illustrate,[26] there remains a contested issue as to whether various other regulations—specifically those having to do with general cost accounting and analysis (*see* 41 C.F.R. § 1–3.807)—must be applied by the Commission. As to this matter, the Edwards affidavit is irrelevant and summary judgment was therefore improper. A remand is necessary for further proceedings on those procurement regulations outside the scope of the Edwards affidavit.

## IV.

In conclusion, we reverse the District Court's dismissal of Counts 1 and 4 of the NTEU complaint and remand so that that court may determine whether the Commission has complied with the standard set forth in Section 8902(i) of the Health Benefits Act. And we reverse and remand the District Court's grant of summary judgment on Counts 2 and 3 with regard to all procurement regulations save those relating to administrative expenses in 41 C.F.R. § 1–15.2. Summary judgment as to the latter is affirmed.

*So ordered.*

---

25. *Cf.* Rule 56(d), Fed. R. Civ. P. (discussing partial summary judgment).

26. *See* brief for appellees at 43 (arguing that cost analysis provisions of 41 C.F.R. § 1–3.807–3(a)(2) and other provisions of Part 1–3 do not apply to the Blue Cross-Blue Shield contract because the original of that contract predates the regulations and subsequent adjustments of rates do not amount to procurement of new contracts).