**NATIONAL TREASURY EMPLOYEES UNION, et al., Plaintiffs,**

**v.**

**Constance HORNER, Director, Office of Personnel Management, et al., Defendants.**

**Civ. A. No. 84–2573.**

United States District Court, District of Columbia.

Feb. 27, 1987.

Lois G. Williams, Richard S. Edelman, Washington, D.C., for plaintiffs.

Jeffrey S. Paulsen, Judith Ledbetter, Dept. of Justice, Civil Div., Washington, D.C., for defendants.

## MEMORANDUM OPINION AND ORDER

JOYCE HENS GREEN, District Judge.

This opinion is the second concerning plaintiffs' challenge to the government's August 31, 1982 abolition of the Professional and Career Examination (the PACE) and its decision to except from the competitive service the 118 federal jobs formerly governed by that examination. In an earlier decision, *National Treasury Employees Union v. Horner*, 659 F.Supp. 8 (D.D.C.1986) (the "October 15, 1986 Opinion"), this court addressed defendants' contention that plaintiffs lacked standing to bring this action, and directed plaintiffs to file an amended complaint naming as plaintiffs persons hired since August 31, 1982 under the challenged Schedule B hiring authority who had not yet been converted to competitive service status. Plaintiffs filed such a complaint on November 15, 1986. The facts and background relevant to this litigation were set out at length in the October 15, 1986 Opinion and will not be reiterated here. The

court turns directly, therefore, to the issues addressed by the parties in their pending cross-motions for summary judgment.

### I. *Judicial Review*

Defendants contend that defendant Office of Personnel Management's (OPM's) decision to place the former PACE positions in the excepted service is an action committed to agency discretion and therefore not subject to judicial review. Under the Administrative Procedure Act (APA), agency action is subject to review except where precluded by statute, 5 U.S.C. § 701(a)(1), or where that action "is committed to agency discretion by law." *Id.* at § 701(a)(2). This latter exception applies "where 'statutes are drawn in such broad terms that in a given case there is no law to apply.'" *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 820, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). The relevant statute in question here, 5 U.S.C. § 3302, provides:

> The President may prescribe rules governing the competitive service. The rules shall provide, as nearly as conditions of good administration warrant, for—
>
> (1) necessary exceptions of positions from the competitive service.

The only limitations placed on OPM's authority to except positions from the competitive service are the requirements that exceptions be consistent with "good administration," and "necessary." Characterizing these criteria as amorphous and open-ended, defendants argue that the statute provides "no meaningful standard against which to judge the agency's exercise of discretion," *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985), and thus renders any such decision unreviewable.

The exception for action "committed to agency discretion," however, is a very narrow one, *Overton Park,* 401 U.S. at 410, 91 S.Ct. at 820, and as defendants recognize, the question of reviewability ultimately turns on congressional intent. *Southern Railway v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 454, 99 S.Ct. 2388, 2394, 60 L.Ed.2d 1017 (1979). The structure and purpose of the civil service laws at issue here demonstrate that Congress intended appointment to the civil service through competitive examination to be the norm, and that placement of positions in the excepted service is, as the name itself indicates, an exception to that norm, to be undertaken only upon a finding of necessity.

Today's civil service laws trace their origin to the Pendleton Civil Service Act of 1883, 22 Stat. 403, which "provided for the creation of a classified civil service and required competitive examination for entry into that service." *Arnett v. Kennedy,* 416 U.S. 134, 149, 94 S.Ct. 1633, 1641, 40 L.Ed.2d 15 (1974). As the Supreme Court has observed, the Act was "designed to eliminate the abuses associated with the patronage system from much of the federal service," *Hampton v. Mow Sun Wong,* 426 U.S. 88, 106, 96 S.Ct. 1895, 1906, 48 L.Ed.2d 495 (1976) (footnote omitted), and instituted a "system of merit appointment, based on competitive examination, ... replacing a patronage system in which appointment had often been treated as a method of rewarding support at the polls." *Id.* at 107, 96 S.Ct. at 1907. The Senate Report on the bill made this purpose unmistakably clear:

> The single, simple, fundamental, pivotal idea of the whole bill is, that whenever, hereafter, a new appointment or a promotion shall be made in the subordinate civil service in the departments or larger offices, such appointment or promotion shall be given to the man who is best fitted to discharge the duties of the position, *and that such fitness shall be ascertained by open, fair, honest, impartial competitive examination.* The impartiality of those examinations is to be secured by every possible safeguard. They are to be open to all who choose to present themselves. There will be tests of fitness of the applicant for the particular place to which he aspires.

S.Rep. No. 576, 47 Cong., 1st Sess. at 13–14 (1882) (emphasis supplied).

Congress has retained the principle of appointment by merit throughout its various amendments and compilations of civil service law. In enacting a set of merit system principles to govern federal personnel management, Congress reiterated that the "selection and advancement [of such personnel] shall be determined solely on the basis of relative ability, knowledge, and skills, *after fair and open competition.*" 5 U.S.C. § 2301(b)(1) (emphasis supplied). Section 3304 confers upon the President the authority to prescribe rules "which *shall* provide, as nearly as conditions of good administration warrant, for ... open, competitive examinations for testing applicants for appointment in the competitive service...." 5 U.S.C. § 3304(a)(1) (emphasis supplied). Congress has defined the competitive service as "*all* civil service positions in the executive branch, except ... positions which are specifically excepted." 5 U.S.C. § 2102(a)(1)(A) (emphasis supplied). And in granting the President the authority to except positions from the competitive service, Congress required that the exceptions be "necessary," 5 U.S.C. § 2303, not merely convenient or desirable.

Viewed against this backdrop, OPM's discretion to except positions is not so broad as to render its exercise unreviewable. Certainly the requirement that such exceptions be "necessary" is not so amorphous or vague that this court lacks any meaningful standard with which to judge the agency's decision. Courts have reviewed agency action taken under far more general statutory requirements than that involved here. Thus, in *National Treasury Employees Union v. Campbell*, 589 F.2d 669 (D.C.Cir.1978), the Court of Appeals undertook review of the Civil Service Commission's negotiation of insurance rates, where the statute simply required that the rates "reasonably and equitably reflect the cost of the benefits provided." *Id.* at 678. And in *Arizona Power Pooling Ass'n v. Morton*, 527 F.2d 721 (9th Cir. 1975), *cert. denied*, 425 U.S. 911, 96 S.Ct.

1506, 47 L.Ed.2d 761 (1976), the Ninth Circuit held that a statute that simply required an agency to recommend the "most feasible" plan for seeking hydroelectric power was subject to judicial review. *Id.* at 726–28. A requirement of necessity provides a standard at least as definite as, if not more definite than, criteria such as "fairness and equity" or "most feasible." In view of the strong presumption favoring review, and the structure and purpose of the statute, which makes competitive service the norm rather than the exception, the court concludes that OPM's determination to place some 118 entry level positions in the excepted service is subject to APA review.

## II. *The Agency Action*

Plaintiffs claim OPM violated sections 3302(1) and 3305 of title 5 and acted arbitrarily and capriciously in excepting the positions in question from the competitive service. Section 3302(1), of course, is the grant of statutory authority permitting the President to make "necessary exceptions" from the competitive service. In justifying its decision to exercise this power and to convert the positions to excepted service status, OPM stated that it was obligated to abolish the PACE under the *Luevano* Consent Decree, *see Luevano v. Campbell*, 93 F.R.D. 68 (D.D.C.1981); that no alternative written, competitive examinations were available to replace that test; and that the cost of developing and validating any new examinations would be prohibitive and unwarranted in light of the substantial reduction in hiring expected due to the federal hiring restrictions in effect at the time. 47 Fed.Reg. 38,257 (1982). These reasons, defendants argue, demonstrate that the action was necessary, and that the agency acted reasonably. In addition, defendants note that OPM has developed four job-specific competitive examinations and is in the process of developing three others, thus demonstrating their good faith efforts to comply with the Decree. Plaintiffs challenge each of these assertions. They argue that OPM precipitously abolished the PACE some seven months after the *Lueva-*

*no* Decree took effect, even though the Decree itself contemplated a three-year phase-out, thereby insuring that alternative testing methods would not be available. They note that between October, 1982 and December, 1983, 2,086 persons were hired under Schedule B. *Report to the Chairwoman, Subcommittee on Civil Service, Committee on Post Office and Civil Service, House of Representatives, Appointments to Professional and Administrative Career Positions,* U.S. General Accounting Office (December 10, 1984), Addendum at 64. Although this figure is slightly less than half the number hired the year prior to the *Luevano* Decree, plaintiffs argue that it is nevertheless substantial, and demonstrates the extent to which the purposes underlying the civil service laws can be undermined when such an unprecedented number of jobs are excepted from the competitive service. Finally, plaintiffs attack OPM's justification that the cost of developing new tests is prohibitive. They note that OPM has never attempted to demonstrate why the cost is prohibitive, but has simply relied on the bald assertion that this is so. They argue that many employers have been required to shoulder the cost of validating examinations in order to comply with Title VII, *see, e.g., Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), and that cost alone does not excuse compliance.[1]

■■■ The "arbitrary and capricious" standard of review, of course, is a deferential one. A court may not set aside an agency's decision that is rational, based on consideration of the relevant factors and within the agency's scope of authority. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.,* 463 U.S. 29, 42, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). Reviewing courts are not to substitute their judgment for that of the agency; rather, they are to determine whether the agency has considered the relevant data and articulated a satisfactory explanation for its action, including a " 'rational connection between the facts found and the choice made.' " *Id.* at 43, 103 S.Ct. at 2866 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 158, 83 S.Ct. 239, 240, 9 L.Ed.2d 207 (1962) ). Judicial deference, however, is not without its limits. Just as an agency may not rely on after the fact rationalizations to justify its actions, *see SEC v. Chenery Corp.,* 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947), so too it may not proffer conclusory statements or unsubstantiated claims in defense of its decisions. Yet OPM has done precisely that here. While it claims that the development of alternatives to the PACE is impracticable and unduly expensive, it offers virtually no evidence other than its own "say so" in support of those assertions. Reviewing courts are not obliged, in the name of judicial deference, to uphold agency action on the basis of purely self-serving statements.

Defendants' first justification for their decision is that they were obliged by the *Luevano* Consent Decree to abolish the PACE. This of course explains why the PACE itself was eliminated, but it does nothing to demonstrate that alternatives to that examination were too costly or otherwise unavailable. The Decree itself gave

---

**1.** Plaintiffs also claim that section 3305 mandates bi-annual examinations, and provides no exception for cost. Section 3304, however, states that the President *"may* prescribe rules which shall provide ... for open competitive examinations...." 5 U.S.C. § 3304(a)(1) (emphasis supplied). Section 3305(a) provides that OPM "shall hold examinations for the competitive service at least twice a year in each State and territory ... where there are individuals to be examined." 5 U.S.C. § 3305. Defendants argue, and the court agrees, that the legislative history, statutory structure and prior agency construction and practice make clear that sec-

tion 3305 was designed to insure that, when examinations are held, they are administered across the nation, so as not to disadvantage those living far from Washington, D.C. It does not require OPM, however, to conduct two examinations a year, regardless of the federal government's employment needs. *See* U.S. Civil Service Commission, Third Ann.Rep. 40 (1886) ("The examinations have not for their object to conduct an endless number of competitions for mere curiosity, or to examine as many persons as may be pleased to enter them regardless of the needs of the public service").

OPM three years to phase out the PACE, yet the agency abolished the examination just seven months after the Decree took effect. Whether or not that action was consistent with the settlement in *Luevano*, it was in no way compelled by the Decree. Thus, while defendants were justified in abolishing the PACE, they may not rely on their own precipitous action to bootstrap their claim of impracticability; at a minimum, they were obliged to explain why it was impossible to develop a single alternative to the PACE before it was abolished, or why it was necessary to abolish the examination nearly two and a half years ahead of schedule, when no alternatives were available.[2]

At bottom, the underlying justification for defendants' decision to except the jobs in question from the competitive service is cost. The expense of developing and validating alternatives to the PACE, defendants claim, was prohibitive and unwarranted in view of the reduction in hiring anticipated at the time. It is true that the number of people hired between October, 1982 and December, 1983 into the PACE positions in question—some 2,089 persons—was slightly less than half the number hired the year before. Nonetheless, this figure is not an insubstantial one, and as defendants concede, the number of external hires has increased in the years since. Thus, a considerable number of people have become federal employees without the benefits of competitive service status, *see* October 15, 1986 Opinion at 4–5 (discussing significance of that status), and without demonstrating their fitness for such employment through "fair and open competition" as Congress intended. 5 U.S.C. § 2301(b). Defendants nevertheless maintain that "conditions of good administration" warrant such hiring, and that the prohibitive cost of implementing alternative tests makes the use of Schedule B hiring

necessary. They have offered nothing in the way of concrete proof, however, in support of that claim, either at the time of the decision or during this litigation. Indeed, despite plaintiffs' challenge to their cost justification as a bald and unsubstantiated claim, defendants have come forward with no figures indicating what the cost of alternative tests would be, nor any other evidence demonstrating that they undertook any sort of cost-benefit analysis.

■ Indeed, defendants argue that budgetary matters are peculiarly within an agency's expertise and discretion, and are therefore singularly ill-suited to judicial resolution. The cases they cite in support of this proposition, however, involved agency decisions not to regulate activities otherwise within their jurisdiction. In *WWHT, Inc. v. FCC*, 656 F.2d 807 (D.C.Cir.1981) and *NRDC v. SEC*, 606 F.2d 1031 (D.C.Cir. 1979), for example, this Circuit noted that agency decisions *not* to regulate typically involve factors not inherently susceptible to judicial review, such as considerations of budget and personnel allocation, the balancing of competing policies, and trends within the regulated industry itself. *See WWHT*, 656 F.2d at 817. These cases did not hold that all decisions affecting an agency's budget are unreviewable, but rather recognized that agency decisions over when and how to regulate a given activity are matters typically committed to an agency's discretion. The present case is vastly different. Defendants have not declined to exercise a broad grant of regulatory authority; instead, they have invoked a statutory exception which permits them to place federal jobs in the excepted service when it is *necessary* to do so. Having concluded that action taken under this statutory exception is reviewable, this court must determine whether the action was

---

**2.** Defendants suggest that there can be no serious quarrel with their decision to eliminate, sooner rather than later, a test found to have discriminatory impact on minority groups. That, of course, was the express goal of the *Luevano* Consent Decree. That Decree, however, also called for the development of alternatives to the PACE. While the government's compliance with that Decree is not presently before the court, it is somewhat disingenuous for defendants to rely on one goal of the Decree to justify its actions while essentially ignoring that settlement's other goal.

rational or arbitrary. Even under the APA's deferential standard of review, courts may not uphold agency action on the basis of self-serving, conclusory and wholly unsubstantiated claims of undue expense. This failure to marshal any evidence supporting its claims of excessive cost is all the more egregious where defendants have had ample opportunity to develop the record and have themselves moved for summary judgment. Nor are defendants correct in asserting that courts are so lacking in the necessary expertise that they must in effect take an agency's word for it when it comes to matters of budgetary restraints. Had defendants here offered evidence of the costs of developing alternative tests and the projected number of anticipated hires, this court could then assess whether the agency's decision was at least rational, and would be obliged to uphold any such rational decision even were it one the court might not have reached. On the present record, however, no such determinations can be made as the agency has failed to "articulate a satisfactory explanation" for its decision. Congress has directed that the "selection and advancement [of federal personnel] should be determined solely on the basis of relative ability, knowledge and skills, after *fair and open competition*," 5 U.S.C. § 2301(b)(1) (emphasis supplied), and has made clear that competition requires "competitive *examinations* for testing applicants for appointment. . . ." 5 U.S.C. § 3304(a)(1) (emphasis supplied). While Congress has given the Executive authority to except certain positions from this requirement, it has directed that such exceptions be made when necessary and warranted by considerations of good administration. Bald assertions of undue expense and impracticability, without more, do not amount to a showing of necessity. To rule otherwise would effectively confer upon OPM unfettered discretion to except positions from the competitive service whenever the agency found it convenient to do so. Accordingly, the court must enter summary judgment in favor of plaintiffs on their APA claims.

### III. *Relief*

In their complaint, plaintiffs ask this court to invalidate and enjoin OPM's regulation creating non-competitive Schedule B appointment authority for GS–5/7 PAC positions; to order OPM to establish and administer competitive examinations for those positions; to convert all employees appointed to Schedule B GS–5/7 PAC positions to competitive service GS–5/7 PAC positions; to retroactively promote, with back pay, all GS–5/7 Schedule B appointees who would have been eligible for career ladder promotions had they been appointed to competitive service positions and to credit them with full competitive service tenure; and to award reasonable attorneys' fees.

■ In view of the Court's determination that OPM's placement in the excepted service of all 118 job categories formerly governed by the PACE was arbitrary and capricious, plaintiffs are clearly entitled to the declaratory and injunctive relief they seek concerning the challenged regulation. In addition, it is obvious that any such declaration and injunction must also be accompanied by an order directing OPM to establish alternative examinations. Today, six years after the *Luevano* Consent Decree was signed and four and a half years after defendants abolished the PACE, OPM has developed tests covering only four of the 118 jobs formerly subject to the PACE requirement.[3] Although defendants' compliance with that Decree is not presently before the court, it is relevant for purposes of determining how quickly defendants must implement new testing procedures to note that OPM agreed to develop alternative, job specific examinations within three years of the Decree's January 18, 1982 effective date. *Luevano* Consent Decree

---

**3.** In an affidavit dated December 1, 1986, defendants claim OPM has developed and implemented 14 job-specific examinations for positions governed by the PACE. Declaration of Donald L. Holum, ¶ 17. Of these, however, all but four were implemented *before* the Consent Decree took effect. *See* Federal Personnel Manual (FPM) Bulletin 213–32 at 3.

§ 13(a).[4] As noted above, civil service law requires defendants to administer competitive examinations when selecting federal employees except when considerations of good administration make it necessary to exempt jobs from this requirement, and this court has found that defendants have not adequately demonstrated the necessity of placing the 118 jobs at issue in the excepted service. It follows then, that defendants must administer a test or tests for these positions. It is not for this court to determine or dictate the specific nature or requirements of this test or tests; civil service law demands only that they be open, fair and competitive. Whatever additional requirements may be imposed by federal civil rights laws such as Title VII, or by the Consent Decree, is not for this court to say in this case.[5] Accordingly, the court will order defendants to implement, within six months from the date of this Order, a fair, open and competitive examination or examinations to govern appointment to the PAC positions still governed by the Schedule B authority provided in 5 C.F.R. §§ 213.3202(1).

Plaintiffs' claims for retroactive relief, however, stand on a different footing. As previously noted in the October 15, 1986 Opinion, the Supreme Court squarely held in *United States v. Testan*, 424 U.S. 392, 96 S.Ct. 948, 47 L.Ed.2d 114 (1976), that neither the Classification Act, 5 U.S.C. § 5101 *et seq.*, nor the Back Pay Act, 5 U.S.C. § 5596, permit recovery of retroactive back pay or promotions, and that, in the absence of any statutory provisions creating a substantive right to such recovery, the United States has not consented to be sued for such damages. In that case, as here, plaintiffs claimed that they had been "denied the benefit of the position to which [they] should have been, but [were] not, appointed." *Id.* at 402, 96 S.Ct. at 955. The Court, however, declined to depart from "the established rule ... that one is not entitled to the benefit of a position until he has been duly appointed to it." *Id.* The Classification Act, the Court noted, provided only for *prospective* reclassification, but did not "ma[ke] available to a party wrongfully classified the remedy of money damages through retroactive reclassification." *Id.* at 403, 96 S.Ct. at 955. Similarly, the Court ruled that the Back Pay Act "was intended to grant a monetary cause of action only to those who were subjected to a *reduction* in their duly appointed emoluments or positions." *Id.* at 407, 96 S.Ct. at 957 (emphasis added).

Plaintiffs here contend that they are entitled to retroactive promotions and back pay if they can "clearly establish" that they would have been promoted had they been properly classified initially as competitive service employees.[6] In so arguing, they rely on *Boese v. Dep't of the Air Force*, 784 F.2d 388 (Fed.Cir.1986), a case in which an improperly discharged federal employee sought reinstatement to a position higher than that which he had previously held. In rejecting the employee's claim for a retroactive promotion, the court stated that

---

**4.** It is also worth noting that the Decree itself anticipated one of defendants' principal contentions in this suit, namely that "[s]ome PACE job categories have relatively few vacancies." *Luevano* Consent Decree § 13(a). Rather than simply excepting these jobs from the competitive service, however, OPM agreed in the Decree to "Develop alternative examining procedures for a group of such job categories." *Id.*

**5.** In this regard, the court notes that the *Luevano* Consent Decree prohibits OPM from replacing the PACE with another comprehensive examination. *Luevano* Consent Decree § 13(a). The court's Order today in no way excuses defendants from any obligations they may have under the Decree. That Decree, in essence, defined OPM's obligation under Title VII, while this Order concerns only the civil service laws. It hardly need be said that OPM is obliged to abide by both statutes, and may not satisfy one at the expense of the other.

**6.** Although plaintiffs initially declined to brief this issue until after the court rendered its decision as to class certification, *see* Plaintiffs' Opposition to Defendants' Motion for Summary Judgment at 29 n. 7, they subsequently discussed the question in response to defendants' challenge to their standing. *See* Plaintiffs' Second Supplemental Memorandum Concerning Status of Case at 3–4.

"[o]nly if some provision of law *mandates* a promotion during the interim period, or *perhaps* if the employee could 'clearly establish' that he would in fact have been promoted, would the agency be required to reinstate him at that higher level." *Id.* at 390 (emphasis added). Read in context, the court's "clearly establish" test for retroactive promotions is at best qualified dicta. In addition, to the extent *Boese* involved an improper discharge and reinstatement, the court's dicta can be read as consistent with *Testan,* for a discharged employe who can clearly establish that, but for a wrongful personnel action, she would have received a promotion, is essentially one who can demonstrate a reduction in his or her duly appointed emoluments or position. Such an employee has been duly appointed to a position that entitled her to a promotion, and the wrongful employment action results in a deprivation of that entitlement. Here, by contrast, none of the named or putative plaintiffs has ever been appointed to competitive service status, and thus none has ever enjoyed whatever promotion entitlements attach to such status.

Finally, even if this court were to adopt the *Boese* court's "clearly establish" test, plaintiffs could not satisfy it here. As plaintiffs themselves state in their opening brief, competitive service employees "are eligible for promotion if they satisfy the requisite requirements of [one] year's time in grade and [one] year of qualifying experience, *and if they have demonstrated the ability to perform at the higher grade.*" Plaintiffs' Motion for Summary Judgment at 14 (emphasis added). This last, underscored, requirement makes unmistakably clear that promotions are not mandated, but simply discretionary. Indeed, plaintiffs

concede that "career ladder promotions to Grade 9 in the competitive service [are] not … automatic.…" *Id.* at 14 n. 15. Thus, plaintiffs cannot *clearly establish* that they would have been promoted to the GS–9 level but for defendants' wrongful classification, for even if they had been appointed to the competitive status initially, they would not have been entitled to an automatic or mandatory promotion upon completion of one year's service. The discretion involved in such promotion decisions necessarily defeats any showing of entitlement as contemplated by the *Boese* dicta.[7]

■ As the Supreme Court made clear in Testan, "[t]here is a difference between prospective reclassification, on the one hand, and retroactive reclassification resulting in money damages, on the other." 424 U.S. at 403, 96 S.Ct. at 955. While the latter is, as just noted, unavailable, the former may be obtained either through the procedures established in the Classification Act, or as plaintiffs have done in this case, through the invocation of a federal court's mandamus jurisdiction. *Id.* Here the court has found that defendants arbitrarily and capriciously placed the 118 PAC positions in the excepted service on August 31, 1982. It follows that all persons hired into those positions since that date who have not yet been converted to competitive status must be so converted. Otherwise, such persons would remain in the excepted service while those hired after the effective date of this court's injunction against further Schedule B hiring would enjoy competitive service status. Again, however, persons converted to competitive service status by operation of this Order are not entitled to competitive service tenure credit for the time they were employed as excepted

---

7. While plaintiffs have suggested that claims for back pay and retroactive promotions would vary among members of the putative class, those variations would be in the amount of back pay or the timing of promotions. The availability of retroactive relief itself, however, would *not* vary among members of the class. Plaintiffs do not suggest that the standards governing promotions in the competitive service from the

GS–5/7 to GS–9 level differ depending on the specific GS–5/7 position, nor do OPM's regulations indicate that there are any such variations. *See* FPM Chapter 315, § 1–5. Because all competitive service promotions to the GS–9 level involve the same degree of managerial discretion, none of the putative class plaintiffs could satisfy the *Boese* standard.

service employees, for such credit is a form of impermissible retroactive relief.

Accordingly, for all the foregoing reasons, it is this 27th day of February, 1987

ORDERED that plaintiffs' motion for summary judgment be and it hereby is granted and defendants' cross-motion for summary judgment be and it hereby is denied; and it is

FURTHER ORDERED that within six (6) months from the date of this Order, defendant OPM must implement a fair, open and competitive examination, or examinations, to govern appointment to PAC positions currently governed by the Schedule B hiring authority provided in 5 C.F.R. § 213.3202(1), and must place such positions in the competitive service; and it is

FURTHER ORDERED that defendants' action placing the 118 PAC positions formerly governed by the PACE in the excepted service and creating Schedule B hiring authority to fill vacancies in those positions be and hereby is declared arbitrary and capricious; and it is

FURTHER ORDERED that defendants be and they hereby are permanently enjoined from exercising the Schedule B hiring authority provided in 5 C.F.R. § 213.-3202(1) after six (6) months from the date of this Order; and it is

FURTHER ORDERED that within ninety (90) days from the date of this Order, defendants must convert to competitive service status all persons hired since August 31, 1982 into the PAC positions formerly governed by the PACE who currently remain excepted service employees; and it is

FURTHER ORDERED that within ninety (90) days from the date of this Order, plaintiffs are to file any motion concerning their entitlement to, and the amount of, an award of attorney's fees; defendants shall file their opposition, if any, within fourteen (14) days of plaintiffs' filing; and plaintiffs shall file any response within seven (7) days of said opposition.

In view of the court's rulings, plaintiffs need not move for class certification. A separate judgment accompanies this Order.