**NATIONAL TREASURY EMPLOYEES UNION, Petitioner**

v.

**UNITED STATES MERIT SYSTEMS PROTECTION BOARD and United States Office of Personnel Management, Respondents.**

No. 82–1206.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 19, 1983.

Decided Sept. 11, 1984.

Wald, Circuit Judge, filed separate con-
curring statement.

Petition for Review of an Order of the Merit Systems Protection Board.

Lois G. Williams, Washington, D.C., with whom Robert M. Tobias and John F. Bufe, Washington, D.C., were on the brief, for petitioner. William F. White also entered an appearance for petitioner.

Mary M. Jennings, Atty., Merit Systems Protection Bd., Washington, D.C., with whom Evangeline W. Swift, Gen. Counsel, Merit Systems Protection Bd., Rita S. Arendal and Calvin M. Morrow, Attys., Merit Systems Protection Bd., Washington, D.C., were on the brief, for respondent, Merit Systems Protection Bd. Alan F. Greenwald, Atty., Merit Systems Protection Bd., Washington, D.C., also entered an appearance for respondent, Merit Systems Protection Bd.

Michael J. Ryan, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Atty., Washington, D.C., were on the brief, for respondent, Office of Personnel Management.

Before WALD, MIKVA and BORK, Circuit Judges.

Opinion for the Court in Parts I–II.C.2 filed by Circuit Judge WALD.

Opinion for the Court in Part II.C.3 filed by Circuit Judge BORK.

Separate concurring statement filed by Circuit Judge WALD.

WALD, Circuit Judge:

Petitioner, National Treasury Employees Union (NTEU), seeks relief from a decision of the Merit Systems Protection Board (MSPB) upholding the validity of an Office of Personnel Management (OPM) regulation, presently published at 5 C.F.R. § 752.-401(c)(10) (1983), which allows federal agencies to place "seasonal" government employees in "nonduty, nonpay" status without affording them the adverse action protections required by the Civil Service Reform Act of 1978 (CSRA or Act), 5 U.S.C. §§ 7501–7543, for federal employees "furloughed" for thirty days or less. Under 5 U.S.C. § 1205(e)(2)(A), the MSPB—when it grants review—must declare a regulation

invalid on its face if it determines that the terms of the regulation, if implemented by an agency, would require an employee to commit any of the prohibited personnel practices set forth in 5 U.S.C. § 2302(b). The NTEU argued before the MSPB that the plain language and legislative history of the CSRA indicate that any short-term layoff of a seasonal employee is a "furlough" within the meaning of 5 U.S.C. § 7511(a)(5). If so, failure to afford furloughed seasonal employees recourse to the adverse action procedures of 5 U.S.C. § 7513 is a prohibited personnel practice, and the OPM regulation is invalid on its face. The OPM countered that, although seasonal workers are generally entitled to the protections of the adverse action provisions, it could properly interpret "furlough" to exclude laying them off for brief periods in accordance with the conditions under which they are employed. Furthermore, it urged, the fiscal impact of providing such procedures for all brief layoffs of seasonal employees would destroy the seasonal employment program.

Based on its reading of the legislative history and policies underlying the CSRA, the MSPB concluded that the OPM had properly defined "furlough" to exclude such temporary layoffs of seasonal employees from the adverse action protections accorded to furloughs under 5 U.S.C. §§ 7511(a)(5) and 7513 and that 5 C.F.R. § 752.401(c)(10) was valid on its face. The NTEU appeals that ruling. The OPM and MSPB argue in this court that we lack

jurisdiction to hear the NTEU's appeal, that the NTEU lacks standing to bring the appeal, and that the regulation should be upheld on the merits. We take jurisdiction of the case, find that the NTEU has standing, and affirm the MSPB's order.

## I. BACKGROUND

### A. The Statutory Scheme

The Civil Service Reform Act of 1978, Pub.L. No. 95–454, 92 Stat. 1111 (codified as amended at 5 U.S.C. §§ 1101–8913), was designed to revamp a personnel management system President Carter termed a "bureaucratic maze which neglects merit, tolerates poor performance, permits abuse of legitimate employee rights, and mires every personnel action in redtape, delay, and confusion." H.R.Rep. No. 1403, 95th Cong., 2d Sess. 2 (1978), *reprinted in* 1 House Comm. on Post Office and Civil Service, 96th Cong., 1st Sess., *Legislative History of the Civil Service Reform Act of 1978*, at 636, 639 (Comm. Print 1979) [hereinafter cited as *CSRA Legislative History* ].[1] In relevant part, it codifies merit systems principles and prohibited personnel practices; replaces the old Civil Service Commission with two agencies, an Office of Personnel Management to act as the central personnel office of the executive branch and a Merit Systems Protection Board and Special Counsel to adjudicate employee appeals and investigate charges of prohibited personnel practices; and es-

---

**1.** For comprehensive histories of the American civil service, *see* P. Van Riper, *History of the United States Civil Service* (1958); A. Hoogenboom, *Outlawing the Spoils: A History of the Civil Service Reform Movement, 1865–1883* (1961); C. Fish, *The Civil Service and the Patronage* (1904). The modern civil service was born with the passage of the Civil Service Act of 1883 (Pendleton Act), ch. 27, 22 Stat. 403 (codified as amended in scattered sections of 5, 18 & 40 U.S.C.). That Act was precipitated by public disapproval of the "spoils system," a civil service policy intended to facilitate the removal of inefficient government personnel, but which instead resulted in wholesale turnovers of personnel in many parts of the government after every election defeat. *See* Note, *Federal Employment— The Civil Service Reform Act of 1978—Removing*

*Incompetents and Protecting "Whistle Blowers,"* 26 Wayne L.Rev. 97, 98 (1979). The Pendleton Act set up a Civil Service Commission empowered to limit political pressures on jobholders and to promulgate rules on various personnel matters, including competitive examinations for positions. As originally passed, however, the Act covered only about 10% of government employees, created few limits on removal powers, and gave no procedural protections to employees. *See* Note, *supra,* at 99. Over the next several decades, attempts to remedy these defects rendered the procedures allowed federal employees to appeal adverse actions time-consuming and complex. *Id.* at 99–105. The CSRA attempted to solve these problems without sacrificing the procedural protections developed in the twentieth century.

tablishes procedures for adverse actions and suspensions.

Of special concern to this case are the CSRA provisions dealing with adverse actions, prohibited personnel practices, and appeals procedures. The CSRA lists removals, suspensions for more than fourteen days, reductions in grade and pay, and furloughs of thirty days or less as adverse actions. 5 U.S.C. § 7512. Whenever the government proposes to take such an action, the employee affected by the action is entitled to the adverse action procedures set out in 5 U.S.C. § 7513, including written notice thirty days in advance, a reasonable time to answer and to furnish supporting affidavits and documentary evidence, representation by an attorney, and a written decision.

Invalidation of OPM rules and regulations that allegedly violate the CSRA provision prohibiting defined personnel practices, 5 U.S.C. § 2302(b), or its adverse action procedures may be sought from the MSPB under 5 U.S.C. § 1205(e),[2] which grants the MSPB discretionary authority to review rules and regulations promulgated by the Director of the OPM in carrying out his personnel management functions under 5 U.S.C. § 1103.[3] The MSPB may grant review on its own motion or when "any interested person" files a petition for review, and must grant review when the MSPB's Special Counsel files a written complaint requesting review. 5 U.S.C. § 1205(e)(1). Once it grants review, § 1205(e)(2)(A) requires the MSPB to declare a rule or regulation invalid on its face if it determines that any provision of the rule or regulation, if implemented by an agency would on its face require any employee to commit a prohibited personnel practice as defined in 5 U.S.C. § 2302(b).[4]

2. 5 U.S.C. § 1205(e) provides:

(e)(1) At any time after the effective date of any rule or regulation issued by the Director in carrying out functions under section 1103 of this title, the Board shall review any provision of such rule or regulation—

(A) on its own motion;

(B) on the granting by the Board, in its sole discretion, of any petition for such review filed with the Board by any interested person, after consideration of the petition by the Board; or

(C) on the filing of a written complaint by the Special Counsel requesting such review.

(2) In reviewing any provision of any rule or regulation pursuant to this subsection the Board shall declare such provision—

(A) invalid on its face, if the Board determines that such provision would, if implemented by any agency, on its face, require any employee to violate section 2302(b) of this title; or

(B) invalidly implemented by any agency, if the Board determines that such provision, as it has been implemented by the agency through any personnel action taken by the agency or through any policy adopted by the agency in conformity with such provision, has required any employee to violate section 2302(b) of this title.

(3)(A) The Director of the Office of Personnel Management, and the head of any agency implementing any provision of any rule or regulation under review pursuant to this subsection, shall have the right to participate in such review.

(B) Any review conducted by the Board pursuant to this subsection shall be limited to determining—

(i) the validity on its face of the provision under review; and

(ii) whether the provision under review has been validly implemented.

(C) The Board shall require any agency—

(i) to cease compliance with any provisions of any rule or regulation which the Board declares under this subsection to be invalid on its face; and

(ii) to correct any invalid implementation by the agency of any provision of any rule or regulation which the Board declares under this subsection to have been invalidly implemented by the agency.

3. The pertinent section of 5 U.S.C. § 1103 provides:

§ 1103. Functions of the Director

(a) The following functions are vested in the Director of the Office of Personnel Management, and shall be performed by the Director, or subject to section 1104 of this title, by such employees of the Office as the Director designates: ...

(5) executing, administering, and enforcing—

(A) the civil service rules and regulations of the President and the Office and the laws governing the civil service; ...

(7) aiding the President, as the President may request, in preparing such civil service rules as the President prescribes....

4. Section 2302(b) sets out eleven prohibited personnel practices: discrimination on the basis of

Under § 1205(e)(2)(B), the MSPB must declare provisions of rules and regulations invalidly implemented if it determines that such a provision, as it has been implemented by an agency through any personnel action or policy adopted in conformity with the provision, has required any employee to violate § 2302(b).

The MSPB considers several factors in deciding whether to grant review under § 1205(e), including the likelihood of the issue being timely reached through ordinary channels of appeal, the extent of the rule or regulation's application to the federal service, and the strength of the arguments against its validity. Joint Appendix at 25. The MSPB also has substantial discretion in how it conducts its reviews. It may make its decisions on the basis of the pleadings alone, or it may consider additional written comments, hold oral arguments, conduct evidentiary hearings, or use any other appropriate procedures. 5 C.F.R. § 1203.16 (1983). If the MSPB then determines that a provision of a rule or regulation is invalid on its face, or as implemented, § 1205(e)(3)(C) requires it to direct agencies to cease compliance with the provision or to correct any invalid implementation.

■ NTEU filed its petition for review of the MSPB final order at issue in this case on March 1, 1982. Joint Appendix at 186. On April 2, 1982, the President approved the Federal Courts Improvement Act of 1982 (FCIA), Pub.L. No. 97–164, 96 Stat. 27 (codified in scattered sections of 28 U.S.C., with minor and conforming amendments to other titles), which by its terms became effective on October 1, 1982, *id.* § 402, 28 U.S.C. § 171 (note). The FCIA granted the United States Court of Appeals

for the Federal Circuit exclusive jurisdiction "of an appeal from a final order of the Merit Systems Protection Board," *id.* § 127(a), 28 U.S.C. § 1295(a)(9), subject to certain exceptions and procedural requirements in section 205 of the CSRA as amended by section 144 of the FCIA, 5 U.S.C. § 7703. The FCIA also repealed certain statutory provisions at issue in this case governing review of MSPB final orders in courts of appeals other than the Federal Circuit. *See* FCIA § 137 (amending 28 U.S.C. § 2342); *id.* § 144 (amending 5 U.S.C. § 7703).

We must therefore determine whether the FCIA has affected our jurisdiction over this case. In deciding essentially the same question, the Third Circuit has noted that

[s]ection 403 of the FCIA, [28 U.S.C. § 171 (note)], does not discuss the effect of the FCIA on petitions for review of MSPB decisions where the petitions were filed before the effective date of the FCIA. However, the FCIA expressly does declare that "[a]ny case in which a notice of appeal has been filed in a *district court* of the United States prior to the effective date of this Act shall be decided by the court of appeals to which the appeal was taken." FCIA, § 403(e) (emphasis added). Moreover, the FCIA does not provide for the transfer of appeals such as this one to the Court of Appeals for the Federal Circuit even though the Act explicitly does order the transfer of cases pending before the Court of Claims, § 403(a), and the Court of Customs and Patent Appeals, § 403(b).... The analogy derived from § 403(e), and the negative implication arising from §§ 403(a) and (b) ... pro-

race, color, sex, religion, national origin, age, handicapping condition, marital status, political affiliation, or conduct not adversely affecting performance; solicitation or consideration of a recommendation not based on personal knowledge or records; interference with any person's freedom of political activity; obstruction of a person's right to compete for employment; unfair influence on any person to withdraw from competition for a position; granting of an unfair employment preference to any person; giv-

ing special preference to an employee's relative; taking or failing to take a personnel action as a reprisal for disclosure of protected information or the exercise of a valid appeal right; discrimination for or against a person because of conduct that does not adversely affect his performance or the performance of others; and taking or failing to take any personnel action violating a law, rule, or regulation implementing or directly concerning the merit system principles set out in 5 U.S.C. § 2301.

vide support for our retention of jurisdiction.

*Lancellotti v. Office of Personnel Management,* 704 F.2d 91, 98 n. 12 (3d Cir. 1983); *see also Scarborough v. Office of Personnel Management,* 723 F.2d 801, 805 (11th Cir.1984). For the reasons stated by the *Lancellotti* court, we think it clear that because the petition for review in this case was filed before the effective date of the FCIA, our jurisdiction is not affected by that act. We therefore turn to examination of the statutory scheme as it existed when the petition for review was filed.

Judicial review under that scheme was governed by the jurisdictional provisions of 28 U.S.C. § 2342 (1976 & Supp. III 1979) [hereinafter cited as former section 2342] and 5 U.S.C. § 7703(b) (Supp. V 1981) [hereinafter cited as former section 7703(b)], and by the standing provisions, still in force, of 28 U.S.C. § 2844 and 5 U.S.C. § 7703(a). Former section 2342 conferred "exclusive jurisdiction" on the courts of appeals to enjoin, set aside, suspend, or determine the validity of all final MSPB orders, except as provided in former section § 7703(b). Former section 7703(b) in turn provided that, except for cases involving discrimination, which must be heard in the district courts, "a petition to review a final order or final decision of the Board shall be filed in the Court of Claims or a United States court of appeals as provided in chapters 91 [which governed the jurisdic-

tion of the former Court of Claims] and 158 [containing 28 U.S.C. §§ 2342 and 2344], respectively, of title 28." Section 2344 grants standing to "parties aggrieved" by MSPB final orders, while § 7703(a)(1) provides that "any employee or applicant for employment adversely affected or aggrieved by a final order or decision of the Merit Systems Protection Board may obtain judicial review of the order or decision."

### B. *Facts and Proceedings of This Case*

On February 7, 1980, the NTEU, which is the exclusive representative of over 120,-000 federal employees, petitioned the MSPB, pursuant to 5 U.S.C. § 1205(e), to review three OPM regulations, alleging the regulations were invalid on their face. On January 13, 1981, the MSPB granted the petition for review regarding the seasonal-worker furlough regulation, 5 C.F.R. § 752.401(c)(10) (1983) (originally published at 5 C.F.R. § 752.401(c)(9)), and declined to review the other two.[5]

5 C.F.R. § 752.401(c)(10) excludes "[p]lacement of an employee serving on an intermittent, part-time, or seasonal basis in a nonduty, nonpay status in accordance with conditions established at the time of appointment" from the adverse action provisions of 5 U.S.C. §§ 7511–7514. The NTEU argued to the MSPB that § 752.-401(c)(10) is invalid on its face because seasonal workers[6] are "employees"[7] for the

---

**5.** The MSPB declined to review 5 C.F.R. § 771.-204 (1983), which permits agencies to exclude bargaining unit employees from the coverage of agency grievance systems, and § 752.401(c)(2) (1983), which excludes actions that entitle employees to grade retention under 5 C.F.R. pt. 536 from adverse action procedural requirements. The MSPB concluded that there was little likelihood that the NTEU would prevail on the merits with respect to its challenges to either regulation.

**6.** The record discloses no statutory or regulatory definition of "seasonal employee." *See* Joint Appendix at 176. Only OPM's Federal Personnel Manual offers a definition, describing a seasonal employee as "one who works on an annual recurring or on-call basis and for less than 2,080 hours per year." FPM Supp. 296–33, ch. S15–2(e) (1982).

It appears, however, from the material submitted to the MSPB, that the seasonal workforce can be divided into three groups: (1) employees who work less than full-time, year-round schedules but are classified as seasonal, primarily because of full-time employment ceilings imposed by the Office of Management and Budget on federal agencies; (2) seasonal employees who are hired for fixed tours of duty and work during a discrete and relatively predictable season; and (3) "on-call" seasonal workers, who do not have specific tours of duty, work at least six months per year but on an unpredictable basis designed to meet rapidly fluctuating workloads, and may eventually be converted to full-time status. *See* MSPB Brief at 10–11; Joint Appendix at 84, 88, 91, 93, 101, 107, 134.

The origins and extent of seasonal employment in the federal government are somewhat vague. Joint Appendix at 176. The OPM believes that the practice of hiring employees spe-

purposes of the CSRA's adverse action protections, placing a seasonal worker in non-duty, nonpay status is a "furlough" of that worker within the meaning of 5 U.S.C. § 7511(a)(5),[8] and a furlough of a seasonal worker for thirty days or less must therefore give rise to the procedural protections of 5 U.S.C. § 7513.[9]

The MSPB agreed to review the regulation, stating that the NTEU's petition raised valid questions as to whether the OPM had exceeded its authority by so restricting the adverse action procedures of 5 U.S.C. §§ 7511–7514. It therefore directed the NTEU and OPM to file briefs and affidavits addressing these issues, and sought public comments. Joint Appendix at 27.

The MSPB ordered the OPM to provide information regarding the nature and extent of seasonal employment in the federal government; in response, the OPM provided factual submissions from ten federal agencies. *See* Joint Appendix at 66–172. The Office of Management and Budget also submitted comments concerning the government-wide impact of requiring adverse action procedures when seasonal employees are placed in nonduty, nonpay status.

After a review of all submissions, the MSPB issued an opinion and order on February 10, 1982, concluding that Congress did not intend that the layoff of a seasonal employee, when accomplished in accordance with the terms of appointment, should be deemed an adverse action furlough under §§ 7511 and 7513. Joint Appendix at 180–84. It therefore found the regulation valid on its face and dismissed the NTEU's petition for review. This appeal followed.

## II. ANALYSIS

Although they tend to merge the first two, the parties identify three issues on appeal: (1) whether this court has jurisdiction to review the MSPB's decision; (2) whether the NTEU has standing to seek that review; and (3) whether the MSPB correctly decided that 5 C.F.R. § 752.-401(c)(10) is valid on its face. We take up the matters of jurisdiction and standing first, since a negative conclusion on either of those issues would preclude any consideration of the regulation's validity.

### A. *Jurisdiction*

The OPM and the MSPB assert that this court lacks jurisdiction to hear the NTEU's appeal because neither former section 2342 nor former section 7703 provides a jurisdictional basis for an appeal from a decision by the MSPB upholding the facial validity of an OPM regulation under § 1205(e).

---

cifically to manage fluctuating workloads has been in existence for fifty years or more, but that these employees received temporary rather than permanent positions until about 1960. *Id.* at 70. It has ascertained that ten agencies employ approximately sixty thousand seasonal employees, and estimates that more than one hundred thousand such employees are employed by more than one hundred federal agencies. *Id.* at 70–71. Three agencies, the Internal Revenue Service, the National Park Service, and the Forest Service, employ three-fourths of the known seasonal employees. *Id.* at 78.

Seasonal employees are permanent, career employees, appointed under the same authority and from the same registers as full-time permanent employees. Joint Appendix at 35. Unlike temporary employees, they are entitled to most of the fringe benefits of federal employment, including job security, retirement benefits, health and life insurance coverage, within-grade step increases, promotions, access to other job opportunities within the employing agency, accrual of annual and sick leave, inclusion in bargaining units, and, in general, the protection of adverse action laws and reduction-in-force regulations. *Id.* at 75, 177.

7. For adverse action purposes, 5 U.S.C. § 7511(a)(1)(A) defines "employee" as "an individual in the competitive service who is not serving a probationary or trial period under an initial appointment or who has completed 1 year of current continuous employment under other than a temporary appointment limited to 1 year or less."

8. 5 U.S.C. § 7511(a)(5) defines "furlough" as "the placing of an employee in a temporary status without duties and pay because of lack of work or funds or other nondisciplinary reasons."

9. Seasonal workers may appeal furloughs of more than thirty days to the MSPB under reduction-in-force provisions. *See* MSPB Brief at 40 n. 40; 5 U.S.C. §§ 1205(a)(1), 3502; 5 C.F.R. §§ 1201.3(a), 351.901 (1983).

They argue that judicial review of MSPB orders under § 1205(e) is limited to orders dealing with specific personnel actions that have already adversely affected particular employees. The government concedes, first, that § 1205(e)(2)(B) orders, which involve the validity of OPM regulations as *implemented* through individual personnel actions, could be challenged initially in the courts of appeals under former section 7703, *see* MSPB Brief at 23 n. 24, and, second, that former section 7703(d) permits the Director of the OPM to seek review of MSPB orders in this court if he determines that the MSPB misinterpreted a "civil service law, rule, or regulation affecting personnel management and that [its] decision will have a substantial impact on a civil service law, rule, regulations, or policy directive." [10] It urges, however, that under the CSRA as originally enacted, Congress did not intend to place review of the *facial* validity of civil service regulations in the courts of appeals. Section 1205(e) was added to the CSRA, it asserts, as an internal management audit to alleviate congressional concern that the Act's assignment of the adjudicatory and personnel management responsibilities formerly exercised by the Civil Service Commission (CSC) to OPM, an office headed by a single political appointee, would unduly decrease the protection against abuses of the merit system the bipartisan CSC had previously provided. The addition of § 1205(e) to the CSRA cannot, the government contends, be taken as evidence of any congressional intent to extend jurisdiction to the courts of appeals to review § 1205(e)(2)(A) orders determining the facial validity of OPM regulations. Instead, the government concludes, since the relief sought in such cases is entirely prospective in nature and no regulation is being challenged as invalidly implemented, initial judicial review of the facial validity of OPM regulations was placed in the district courts, not in the courts of appeals, just as it would have been if the MSPB declined to review the regulation at all.

For several reasons, we are not convinced by this argument. First of all, the plain language of the CSRA review provisions as originally enacted granted the courts of appeals jurisdiction to review *all* final orders of the MSPB,[11] except those that could instead be filed in the Court of Claims or involved discrimination. Nothing in the text of former section 2342 or former section 7703 even hints at the government's suggested distinction between MSPB orders determining the facial validity of a civil service regulation and all other MSPB final orders. Thus, the statute on its face grants jurisdiction to this court to hear the NTEU's appeal.

Second, nothing in the legislative history of the CSRA contradicts its plain language by indicating either that these particular MSPB orders should be unreviewable or that the courts of appeals are improper forums for that review. The administra-

---

**10.** The MSPB would, however, limit § 7703(d) so as to permit the Director of the OPM to petition for review only of MSPB interpretations rendered in individual personnel actions. *See* MSPB Brief at 23 n. 25. This interpretation of § 7703(d) is not persuasive, since the statute itself makes no such distinction and the OPM would then be able to seek review if the MSPB declares an OPM rule or regulation invalid on its face in the course of reviewing an individual personnel action, but would have no recourse if the MSPB reaches the identical conclusion in a § 1205(e)(2)(A) review of the regulation by itself. This would frustrate the apparent policy underlying § 7703(d) of permitting the OPM to seek relief from important MSPB decisions.

In addition, the government apparently admits that the courts of appeals are the proper forums for review of MSPB rulemaking, thereby recognizing that these courts are authorized to review some kinds of MSPB actions other than those involving individual adverse actions. *See* NTEU's Reply Brief at 7 n. 5.

**11.** There is no question that decisions like the one at issue here are final orders of the MSPB since they determine the validity of OPM regulations. *See* OPM Brief at 4. The term "final MSPB order" has been defined as an order "that imposes an obligation, denies a right, or fixes some legal relationship usually at the consummation of an administrative process." *Dunn v. United States Dep't of Agriculture*, 654 F.2d 64, 68 n. 2 (Ct.Cl.1981), *quoting Honicker v. United States Nuclear Regulatory Comm'n*, 590 F.2d 1207, 1209 (D.C.Cir.1978) (per curiam), *cert. denied*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 374 (1979).

tion-sponsored bill that initiated congressional efforts at major civil service reform in 1977 contained no provision for MSPB review of OPM rules or regulations, nor any provision, as a result, for judicial review from any such MSPB action. *See* 1 *CSRA Legislative History* at 1–64. Section 205 of the bill did, however, provide that any employee or applicant for employment adversely affected or aggrieved by a final order or decision of the MSPB could obtain judicial review of the order or decision in the Court of Claims or a court of appeals. *Id.* at 23. Section 206 amended 28 U.S.C. § 2342, the code provision dealing with court of appeals jurisdiction, to conform with § 205. *Id.* at 24.

As reported from the House Committee on Post Office and Civil Service on July 31, 1978, the House bill (H.R.11280) still contained no provisions for MSPB review of OPM rules and regulations or for judicial review of resulting MSPB orders. But § 205 of the House bill now provided that employees adversely affected or aggrieved by MSPB final orders or decisions were to seek judicial review in the Court of Claims or in federal district court rather than in the courts of appeals. 1 *CSRA Legislative History* at 534.

The committee report accompanying H.R.11280 did not explain why the committee had substituted the federal district courts for the court of appeals. It stated only that "[t]he new section 7702(a) provides for judicial review by the Court of Claims or any United States district court of decisions of the Board appealed by an employee or applicant for employment." H.R.Rep. No. 1403; 95th Cong., 2d Sess. 23 (1978), *reprinted in* 1 *CSRA Legislative History* at 636, 660.

The bill reported from the Senate Committee on Governmental Affairs on July 10, 1978 (S. 2640), likewise contained no provisions for MSPB review of OPM rules or regulations or for appeal to the courts from the MSPB decision. Unlike the House bill, however, § 205 of the Senate bill designated the Court of Claims and the courts of appeals as the forums for review of MSPB

final orders. 2 *CSRA Legislative History* at 1395.

The committee report accompanying S. 2640 explained in some detail its reasons for placing jurisdiction in the courts of appeals to "review MSPB orders and decisions. In particular, the committee wanted to limit any variation in the outcome of appeals by aggrieved employees from adverse action decisions by restricting the number of forums in which such appeals could be heard. It created an exception for cases involving discrimination, however, reasoning that additional factfinding might be required, that district courts were the existing forums for discrimination cases not involving the government, and that uniformity would be better furthered by continuing jurisdiction in the district courts over such claims. S.Rep. No. 969, 95th Cong., 2d Sess. 62–63 (1978), U.S.Code Cong. & Admin.News 1978, p. 2723, *reprinted in* 2 *CSRA Legislative History* at 1461, 1526–27.

Section 1205(e), which allows MSPB review of OPM rules and regulations, was introduced by Senator Mathias on the Senate floor on August 24, 1978, as an amendment to § 202 (§ 1205). Senator Mathias explained that the amendment was intended to correct deficiencies in the reported bill, which did "not provide sufficient checks on the policymaking powers of the Director of the Office of Personnel Management. Without some restrictions, the Director of the Office of Personnel Management, as a political appointee of the President, could issue rules which would politicize the civil service in violation of merit system principles." 124 Cong.Rec. 27,561 (1978), *reprinted in* 2 *CSRA Legislative History* at 1659. Senator Percy added that the purpose of the amendment was "to address concerns ... in the Federal bureaucracy." *Id.* at 27,563, *reprinted in* 2 *CSRA Legislative History* at 1662. The amendment was intended, the Senator stated, to address

these fears while retaining the essential structure and thrust of the overall legislation. For instance, the Merit System

Protection Board review procedure is drafted so as not to allow MSPB a role in policymaking, this area being reserved for OPM. It is simply a way to assure that OPM in implementing policy through regulations does not step over the line and commit prohibitive [sic] personnel actions which is the sole standard of review for striking regulations down.

*Id.*

Representative Fisher introduced the same amendment on the floor of the House on September 11, 1978. *Id.* at 28,720, *reprinted in* 1 *CSRA Legislative History* at 884. He stated that the amendment would "add a small bit to the protection of Government employees throughout the Merit System Board.... This amendment simply says that the Merit System Protection Board can review any OPM regulation and if it violates a prohibited personnel practice, then it can overrule that regulation and prevent its going into operation." *Id.* After he pointed out that the same provision was in the Senate bill and Representative Udall added that the administration was willing to accept it, the House agreed to the amendment. *Id.*

The bill passed by the House on September 13, 1978, therefore, allowed the MSPB to review OPM rules and regulations and granted jurisdiction to the Court of Claims and the federal district courts for review of final MSPB orders. S. 2640, 95th Cong., 2d Sess. §§ 202(a), 205, 124 Cong.Rec. 29,221, 29,225, 29,229, *reprinted in* 1 *CSRA Legislative History* at 1142, 1155–56, 1174–75. The Senate bill, passed on August 4, 1978, 124 Cong.Rec. 27,593 (1978), also provided for MSPB review of OPM rules and regulations, but placed jurisdiction to review MSPB orders in the Court of Claims and the courts of appeals. 2 *CSRA Legislative History* at 1743, 1763. A compromise version of S. 2640 passed the Senate on October 4, 124 Cong.Rec. 33,390 (1978), and the House on October 6, *id.* at 34,105. The bill adopted the Senate provision placing jurisdiction in the court of appeals because, according to the conference report, it incorporated "the traditional appellate mecha-

nism for reviewing final decisions and orders of Federal administrative agencies." H.R.Rep. No. 1717 (Conf.Rep.) 95th Cong., 2d Sess. 143 (1978), U.S.Code Cong. & Admin.News 1978, pp. 2723, 2876, *reprinted in* 2 *CSRA Legislative History* at 1843, 1985.

It is clear from the legislative history that former sections 2342 and 7703 were originally drafted when individual employee adjudications were the only OPM actions reviewable by the MSPB. Section 1205(e), allowing MSPB review of OPM rulemaking, was added near the end of the legislative process. So far as appears, Congress never thought specifically about the reviewability of § 1205(e) orders. Thus, there is no support in the legislative history for the distinction the government seeks to draw between unreviewable § 1205(e)(2)(A) orders challenging the facial validity of OPM rules and regulations and reviewable § 1205(e)(2)(B) orders challenging the validity of such rules and regulations as implemented. Far less is there the clear expression of legislative intent that would be needed to overcome the plain language of former sections 2342 and 7703. Indeed, the one clue we have suggests that Congress would have wanted to provide for judicial review of those orders in the courts of appeals. The Conference Committee had the opportunity to exempt § 1205(e) orders from the provisions of former sections 2342 and 7703 when it reconsidered the differing House and Senate versions of these two sections of the statute *after* § 1205(e) was made part of the bill, and did not do so.

██ Congress' failure explicitly to preclude judicial review is especially telling in light of the settled doctrine that "[o]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the court restrict access to judicial review." *Abbott Laboratories v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967), *quoting Rusk v. Cort*, 369 U.S. 367, 380, 82 S.Ct. 787, 794, 7 L.Ed.2d 809 (1962). *See also Carter v. Cleland*, 643 F.2d 1, 3–4 (D.C.Cir.1980); *Hayes International Corp. v. McLucas,*

509 F.2d 247 (5th Cir.), *cert. denied,* 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975). This strong presumption in favor of judicial review suggests that these particular MSPB orders should be reviewable in some forum.[12] Placing jurisdiction in the district courts to review the MSPB's § 1205(e)(2)(A) orders, however, would not only make for an odd rulemaking review, since the district court would typically be considering several challenges to the same rule, only one of which would have to be considered within the constraints of a prior MSPB decision, it would also require us to ignore the plain language of former sections 2342 and 7703 granting review of final MSPB orders to the courts of appeals.[13]

We therefore conclude that we have jurisdiction to review all final MSPB orders, including those determining the facial validity of OPM rules and regulations. Admittedly, the original statutory scheme as we have interpreted it would result in the possibility that actions challenging the same OPM rule or regulation on different grounds might be split between two different forums. Review of § 1205(e)(2)(A) orders would take place in the courts of appeals, which could not take account of other aspects of the rule or regulation that might render it invalid. Other challenges to a particular rule or regulation, including whether its issuance observed legally required procedures or was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," would still have to be brought in the district courts. Such a division of labor holds a potential for some duplication of judicial efforts.

We point out, however, that even under the government's proposal, review of OPM rules and regulations would still be fragmented. Section 7703 would allow the Di-

rector of the OPM and individual employees to seek review of MSPB orders determining the validity of implemented OPM rules and regulations in the courts of appeals. All other challenges to OPM rules and regulations, however, would have to be brought initially in the district courts.

We acknowledge other problems as well. Congress did not require, and the MSPB did not promulgate, fixed procedures for MSPB review of § 1205(e) orders. Unlike the elaborate standards of proof and procedural requirements Congress provided in the CSRA for § 7701 adverse action proceedings before the MSPB, the Act does not allocate the burden of proof, provide the right to a hearing and representation by counsel, or set out any other procedural requirements for § 1205(e) reviews. According to the MSPB's own rules, it may determine the facial validity of a rule or regulation on the basis of the pleadings alone, call for written or oral submissions, issue interrogatories or requests for supplementary information, or hold evidentiary hearings. *See* 5 C.F.R. § 1203.16. In addition, the Director of OPM may, but need not, participate in the proceedings. *See* 5 U.S.C. § 7703(d). Thus, the nature of the administrative record on which the MSPB renders its § 1205(e) decisions is neither set out in the statute nor will it necessarily be uniform from case to case.

■ Finally, § 1205(e)(1)(B) provides that the MSPB has the "sole discretion" to grant review of OPM rules and regulations when the moving party is an "interested person." Unless the MSPB chooses to grant review, such interested parties will have to seek initial judicial review of OPM rules and regulations in the district court under regular APA procedures. The MSPB will, therefore, theoretically be able

---

**12.** If they were not, and initial review jurisdiction from OPM rules was in the district courts under 28 U.S.C. § 1331 and the Administrative Procedure Act (APA), then those courts would review OPM rules and regulations without considering the MSPB's interpretation, thereby rendering the MSPB effort duplicative, time-consuming, and irrelevant to the district court's decision on the same challenge.

**13.** Congress was quite specific when it gave district courts jurisdiction of MSPB decisions elsewhere in the statute. *See* § 7703(b)(2) (discrimination cases); § 1508 (political activity of state and local employees).

to control whether the district courts or the courts of appeals will review challenges to the facial invalidity of OPM rules and regulations through its own unreviewable power to grant or deny administrative review.

■ Despite all these complications, we can find no authority that would allow us to refuse jurisdiction to review the final MSPB order at issue in this case. We do not think that the possibility of a sparse record in some cases is cause to preclude all judicial review. In addition, parties challenging OPM regulations before the MSPB are on notice that its discretion to decide whether to accept the appeal will determine the forum of judicial review.

While Congress did not provide a particularly coherent plan for judicial review of OPM regulations, the general congressional scheme in the CSRA was for cases challenging MSPB decisions to go from the MSPB to the courts of appeals, thereby achieving "more consistent judicial decisions on review" and eliminating "an unnecessary layer of judicial review." S.Rep. No. 969, 95th Cong., 2d Sess. 52 (1978), U.S.Code Cong. & Admin.News 1978, p. 2774, *reprinted in* 2 *CSRA Legislative History* at 1516. The statute is plain, its natural interpretation is generally supported and certainly not contradicted by the legislative history, and the resulting legislative scheme, though imperfect, is not totally unreasonable. We have no authority, under these circumstances, to ignore the statute's plain meaning. As a result, we find that we have jurisdiction to hear this case and turn to the question of standing.

### B. *Standing*

We have concluded that former sections 2342 and 7703(b) conferred jurisdiction on the courts of appeals to review all § 1205(e) orders, and that those sections, unaffected by the Federal Courts Improvement Act of 1982, govern this case. Each of these sections, however, had its own specific standing requirement. Section 2342, part of the Administrative Orders Review (Hobbs) Act, 28 U.S.C. §§ 2341–2351, provides that jurisdiction to review MSPB orders "is invoked by filing a petition as provided by section 2344 of this title." Section 2344, in turn, broadly permits "[a]ny party aggrieved by [a final order reviewable under this chapter to] ... file a petition to review the order of the court of appeals wherein venue lies." Section 7703's grant of standing is, however, more limited. Section 7703(a) provides that "any employee or applicant for employment adversely affected or aggrieved" by final MSPB decisions and orders may obtain such review.

The government argues that § 7703(a) permits only *individual* employees or applicants aggrieved by MSPB orders to appeal to the courts and that the NTEU, because it is not an individual employee but instead a collection of employees, is therefore precluded from obtaining such review.[14] Although it does not specifically discuss § 2344, the government would presumably argue that § 2342 was amended merely to conform to § 7703, and that the specific standing provision in § 7703 controls the general provision in § 2344.

Congress, it is true, amended § 2342 primarily to conform to § 7703, and did not specifically refer to § 2344 when it did so.[15] On the other hand, nothing in the text of

---

**14.** Other sections of the CSRA provide some support for the government's restrictive interpretation of § 7703(a). 5 U.S.C. § 4301, for example, which explains the terms used in the performance appraisal chapter of the CSRA, specifically defines "employee" as an "individual." The same definition appears in 5 U.S.C. §§ 7501 and 7511, which define "employee" for the purpose of the adverse actions chapter of the Act. 5 U.S.C. § 7701, which sets out the procedures for appeal to the MSPB from agency action, states that "employee is defined as in § 7511." In Title VII, the labor-management relations chapter of the CSRA, "employee" is again defined as "individual," while "person" is defined to include "an individual, labor organization, or agency." 5 U.S.C. § 7103. Subsequently, in 5 U.S.C. § 7123, any "person" aggrieved is permitted to appeal an order of the Labor Management Relations Authority.

**15.** *See, e.g.,* H.R.Rep. No. 1717 (Conf.Rep.), 95th Cong., 2d Sess. 37 (1978), *reprinted in* 2 *CSRA Legislative History* at 1843, 1879.

§ 2342, § 7703, or the legislative history of the CSRA indicates that Congress did not want the "aggrieved party" standing provision of § 2344 to apply to review of MSPB orders under § 2342 just as it applies to review of orders of the other five agencies already listed in § 2342. Indeed, § 7703(b)(1) itself says that a petition to review a final order of the Board "shall be filed in ... a United States court of appeals as provided in chapter[ ] ... 158 [the Hobbs Act, of which both §§ 2342 and 2344 are part]."

■ We recognize that a specific statutory provision normally controls a more general provision. But, at least in the circumstances of this case, we do not think § 2344's broad grant of standing for appeal of MSPB orders should be limited by § 7703(a)(1)'s apparently narrower grant of standing to employees and applicants for employment.[16] Unlike the case here, the vast majority of appeals from the MSPB involve adjudications of individual employee appeals from alleged agency adverse actions. When § 7703 was drafted, these were the only appeals the MSPB could hear.[17] For such cases, § 7703(a)'s language in no way conflicts with the aggrieved-party standard of § 2344.

Standing to seek judicial review of an MSPB order requiring an OPM rule or regulation, however, is a separate issue. Congress did not specifically consider who should have standing to appeal § 1205(e) orders. Had it done so, it seems plausible that it would have wanted the expansive aggrieved-party standard of § 2344 to apply. First, although § 7703(a) refers only to employees and applicants for employment, the legislative history suggests that Congress was not trying to restrict standing. On the contrary, it frequently indicated that it was modeling standing in the CSRA on the Administrative Procedure Act, 5 U.S.C. § 702,[18] and § 2344's language ("any party aggrieved") is quite similar to § 702's broad grant of standing for persons challenging agency rulemaking in the district courts ("persons adversely affected or aggrieved by agency action").[19] It also seems unlikely to us that Congress would have wanted to rule out the most likely challenger to § 1205(e) orders, the employees' union, since it granted broad standing to all "interested" persons in § 1205(e)(1)(B) to appeal OPM rules and regulations to the MSPB. It would make little sense to permit the union to appeal to the MSPB and then deny it the right to seek judicial review of the MSPB decision. Such a distinction would serve no useful purpose. It would merely force the NTEU to bring its appeal in the names of one or more of its members instead of in its own name. We conclude, therefore, that § 7703(a)(1) does not restrict standing to individual employees so far as judicial review of MSPB review of OPM rules is concerned.

16. We do not decide whether or not § 7703's references to employees and applicants must be narrowly read to exclude all appeals by an organizational representative of employees. We note, however, that the legislative history indicates that Congress contemplated that broad standing would exist under the section. The Senate committee report, for example, stated that "the wording [of § 7703(a) ] is similar to the general provisions governing the right of review from agency actions found in Section 702 of the Administrative Procedure Act," S.Rep. No. 969, 95th Cong., 2d Sess. 62 (1978), U.S. Code Cong. & Admin.News 1978, p. 2784, reprinted in 2 CSRA Legislative History at 1461, 1526, which grants standing to "persons adversely affected or aggrieved by agency action," 5 U.S.C. § 702.

17. 5 U.S.C. § 7701(a) provides that "[a]n employee, or applicant for employment, may submit an appeal to the Merit Systems Protection Board from any action which is appealable to the Board under any law, rule, or regulation."

18. See, e.g., supra note 16; 124 Cong.Rec. 27,561 (1978), reprinted in 2 CSRA Legislative History at 1658–59 (comments of Senator Mathias) (standing under § 1205(e) was "not meant to be overly restrictive.... [I]t is designed to have the same meaning as that term is given in the context of the Administrative Procedure Act, and all the case law construing its meaning").

19. Cf. Gage v. United States Atomic Energy Comm'n, 479 F.2d 1214, 1218 (D.C.Cir.1973) ("parties" within the meaning of §§ 2342 and 2344 of the Hobbs Act must have participated in the administrative proceedings below).

■ The question remains whether the NTEU is an "aggrieved" party within the meaning of § 2344. In general, an association has standing to sue on behalf of its injured members when they would otherwise have standing to sue in their own right, the interests it seeks to protect are germane to the organization's purpose, and neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Committee for Auto Responsibility v. Solomon*, 603 F.2d 992, 998 n. 13 (D.C.Cir.1979), *cert. denied*, 445 U.S. 915, 100 S.Ct. 1274, 63 L.Ed.2d 599 (1980). More specifically, the Seventh Circuit has held that an organization may have standing under §§ 2342 and 2344 derivative of its members' standing. *See Rockford League of Women Voters v. United States Nuclear Regulatory Commission*, 679 F.2d 1218, 1221 (7th Cir. 1982). Trade associations have also been allowed to sue on behalf of their injured members under the APA's standing section, 5 U.S.C. § 702. *See, e.g., National Automatic Laundry & Cleaning Council v. Schultz*, 443 F.2d 689 (D.C.Cir.1971) (trade association has standing to seek judicial review of agency's interpretative action to vindicate the rights of its members); *Independent Meat Packers Association v. Butz*, 395 F.Supp. 923 (D.Neb.) (trade associations had standing to seek declaratory and injunctive relief from promulgation and enforcement of Department of Agriculture rules revising grading standards for beef), *injunction dissolved and case remanded with instructions*, 526 F.2d 228 (8th Cir.1975), *cert. denied*, 424 U.S. 966, 96 S.Ct. 1461, 47 L.Ed.2d 733 (1976). *See also National Treasury Employees Union v. Campbell*, 589 F.2d 669, 672 n. 4 (D.C. Cir.1978) (NTEU has standing to bring suit on behalf of its injured members for declaratory and injunctive relief and for damages challenging rates negotiated by the Civil Service Commission for federal employees' health insurance).

Certainly the interests the NTEU seeks to protect here—the rights of its seasonal workers to the CSRA's adverse action protections when they are laid off for less than thirty days—are germane to its purposes as exclusive representative of those workers. One of the primary purposes of a union is to represent the interests of its members in challenging employer action believed to be arbitrary or contrary to law. In addition, neither the claim asserted—that an OPM regulation is invalid on its face—nor the relief requested—that the regulation be declared invalid—requires the participation of individual NTEU members in the suit. All that remains, therefore, is to determine whether an individual seasonal worker would have standing to challenge the validity of the MSPB order as an aggrieved party.

■ The courts that have considered the scope of § 2344's "aggrieved party" language have engaged in traditional standing doctrine analysis. *See, e.g., United States v. Federal Maritime Commission*, 694 F.2d 793, 799–809 (D.C.Cir.1982) (MacKinnon, J., dissenting); *United States v. Federal Maritime Commission*, 655 F.2d 247, 251–52 (D.C.Cir.1980). This circuit uses a three-part test to determine whether a party has standing to obtain review of agency action: (1) the complainant must allege injury in fact; (2) the complainant must assert that arbitrary or capricious agency action injured an interest arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question; and (3) there must be no "clear and convincing" indication of a legislative intent to withhold judicial review. *Control Data Corp. v. Baldrige*, 655 F.2d 283, 288–89 (D.C.Cir.), *cert. denied*, 454 U.S. 881, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). *See also Simon v. Eastern Kentucky Welfare Rights Organization*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976); *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153, 90 S.Ct. 827, 829, 25 L.Ed.2d 184 (1970).

Applying the *Control Data* test to this case, we conclude that an individual seasonal worker would have had aggrieved-party standing to sue under §§ 2342 and 2344. The seasonal workers the NTEU represents have suffered injury in fact from the MSPB order in question since it upheld an OPM regulation that denies them the protections of the CSRA's adverse action procedures when they are laid off from their jobs for less than thirty days. This injury would certainly be redressed if we were to hold the regulation invalid on appeal. The workers' interests in having access to the adverse action procedures of the CSRA are clearly within the "zone of interests" to be protected by the Act. Congress expressly provided for judicial review of MSPB orders in § 2342. Because the individual employees represented by the NTEU would therefore have been permitted to bring this suit, the union also has standing to sue the MSPB and OPM.

## C. *Merits*

On the merits, the NTEU urges this court to reverse the MSPB's order holding that 5 C.F.R. § 752.401(c)(10) (1983) properly excludes seasonal workers laid off for thirty days or less from the adverse action procedures of 5 U.S.C. § 7513(b). Specifically, the MSPB decided that laying off seasonal employees in accordance with the conditions under which they are employed is not a furlough within the meaning of 5 U.S.C. § 7511(a)(5) and so may be exempted from § 7513's adverse action procedures by regulation. The NTEU argues that this decision must be reversed because the CSRA on its face includes the short-time layoff of such employees within its definition of adverse actions, Congress' expressed intent is consistent with the statute's plain language, and applying the § 7513 procedures to seasonal layoffs is both reasonable and consistent with the statutory purposes.

In contrast, the MSPB and the OPM argue that Congress intended to exclude short-term layoffs of seasonal workers in accordance with the terms of their employment from the definition of the term "furlough." They urge that "furlough" has historically been construed in civil service parlance and practice to exclude such layoffs and that Congress endorsed that accepted definition. In addition, they contend, the MSPB's decision is consistent with the CSRA's legislative policy favoring employee protections against arbitrary treatment because seasonal workers still have the right to appeal any layoffs not undertaken in accordance with the terms of their employment.

### 1. *The MSPB Decision*

The MSPB acknowledged that the plain language of the CSRA includes layoffs of seasonal workers for thirty days or less within the definition of adverse actions. It nevertheless upheld the validity of the regulation excluding such layoffs, primarily on the ground that under preexisting civil service regulations and policy, seasonal-worker layoffs were not considered adverse action furloughs and that Congress intended to follow those previous CSC definitions when it enacted the CSRA. It rejected the NTEU's contention that if Congress had wanted to carry forward the exclusion of seasonal-worker layoffs in pre-CSRA civil service regulations, it would have listed it along with the other exceptions to adverse actions specifically set out in 5 U.S.C. § 7512(A)–(E).[20] Congress did not do so, the MSPB reasoned, because § 7512(A)–(E) were designed to exclude only certain per-

---

20. 5 U.S.C. § 7512(A)–(E) provide that "this subchapter" does not apply to:

(A) a suspension or removal under Section 7532 of this title,

(B) a reduction-in-force action under section 3502 of this title,

(C) the reduction in grade of a supervisor or manager who has not completed the proba-

tionary period under section 3321(a)(2) of this title if such reduction is to the grade held immediately before becoming such a supervisor or manager,

(D) a reduction in grade or removal under section 4303 of this title, or

(E) an action initiated under section 1206 or 7521 of this title.

sonnel actions that otherwise qualified as adverse actions. Since laying off seasonal employees in accordance with the terms of their employment had never been considered to constitute an adverse action furlough any more than the expiration of a temporary appointment had been considered to constitute a "removal" or the termination of a temporary appointment to constitute a "reduction in grade or pay," Congress did not need, the MSPB concluded, specifically to exempt such layoffs in § 7512. Joint Appendix at 181–83.

The MSPB also relied on the fundamental policy of the CSRA that "[t]he Federal work force ... be used efficiently and effectively." 5 U.S.C. § 2301(b)(5). Encouraging the use of seasonal workers furthers this principle, the MSPB stated, by permitting agencies to hire employees for peak work periods when they do not need those employees on a year-round basis. Applying § 7513's adverse action procedures, in particular the thirty-day advance notice provision, to all temporary layoffs of seasonal workers would probably result in the phasing out of seasonals and reliance on "temporary" employees instead.[21] These temporaries would have to be rehired and retrained each time needed. Alternatively, requiring adverse action procedures for short layoffs might force agencies to keep seasonal workers on the payroll when they

had no work to do. Joint Appendix at 180–81.

In addition, the MSPB pointed out that even under the OPM's regulation, seasonal workers are not completely precluded from challenging their layoffs of thirty days or less since they can invoke § 7513's adverse action procedures if the layoffs are not in accordance with the terms of their appointment. Finally, it stated that it was giving substantial deference in interpreting the CSRA to the OPM because it is the agency charged with administration of the personnel provisions of the Act. Joint Appendix at 184.

### 2. *Standard of Review*

■ 5 U.S.C. § 7703(c) directs the courts of appeals to set aside agency action, findings, or conclusions that are arbitrary, capricious, an abuse of discretion, not in accordance with law, procedurally incorrect, or unsupported by substantial evidence. In determining whether an agency's reading of a statute meets this standard, we generally accord deference to its interpretation.[22] *See, e.g., Federal Election Commission v. Democratic Senatorial Campaign Committee,* 454 U.S. 27, 31–32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981) (as a general rule, the "interpretation put on the statute by the agency charged with

---

**21.** Unlike seasonal employees, temporary employees are not permanent career employees, are not hired on an annual recurring or on-call basis, and do not enjoy the same fringe benefits or adverse action protections of the CSRA of federal employment. *See supra* note 6.

**22.** As this court has noted, the reference in § 7703(c) to the setting aside of "agency" action has generated some confusion as to whether the courts of appeals should be reviewing the original agency's or the MSPB's decision. *See Devine v. White,* 697 F.2d 421, 439–40 n. 102 (D.C. Cir.1983). As *Devine* points out, however, "most courts have applied [§ 7703(c)'s] standard of review to the decision of the MSPB ... rather than to the original agency action." *Id. See, e.g., Gipson v. Veterans Admin.,* 682 F.2d 1004, 1008 (D.C.Cir.1982); *Atwell v. Merit Systems Protection Bd.,* 670 F.2d 272 (D.C.Cir.1981). We also note that Congress has recently amended a similar review section (in a statute based on the

CSRA) concerning decisions of the General Accounting Office's Personnel Appeals Board, replacing the words "agency action" with the words "final decision," which points toward judicial review of the reviewing rather than the original agency. *See* Pub.L. No. 97–258, § 755, 96 Stat. 877, 902 (1982), amending 31 U.S.C. § 52–3(*l*)(2) (Supp. V 1981). *But cf. Obremski v. Office of Personnel Management,* 699 F.2d 1263, 1269–73 (D.C.Cir.1983) (construing 5 U.S.C. § 8331(20) of the CSRA). The court in *Obremski* spoke in terms of *OPM's* construction of the statutory provision in question, probably because in that case the MSPB had relied *entirely* on deference to the OPM's interpretation of the statute in reaching its decision. *Id.* at 1268. In this case, although we review the MSPB decision, this determination is not crucial since the MSPB relies on much the same rationale for upholding the validity of the regulation as the OPM did in issuing it.

administering it is entitled to deference").[23] The courts, however, "are the final authorities on issues of statutory construction [and] must reject administrative constructions of [a] statute ... that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement." *Id.* at 32, 102 S.Ct. at 42. In light of these guidelines, we affirm the order of the MSPB for the reasons stated in Part II.C.3 of the opinion of the Court.

BORK, Circuit Judge:

### 3. The Meaning of the Statute

NTEU contends that when a seasonal worker is temporarily laid off, in accordance with conditions agreed to by the worker at the outset of his employment, the layoff constitutes a "furlough." Since a worker who is furloughed is entitled to "adverse action" protections, it follows, according to NTEU, that seasonal workers may not be laid off temporarily, as agreed, without the full panoply of procedural rights that must be provided those against whom the government wishes to take an adverse action.

This argument is inherently implausible. It does not fit ordinary English usage to call fulfilling the terms of an agreement between an agency and an employee an "adverse action" against the employee. Indeed, the statutory prescription of procedures is meaningless in the context of an agreed layoff. Thus, 5 U.S.C. § 7513(b) (1982) provides that an employee against whom an adverse action is proposed is entitled to:

(1) At least 30 days' advance written notice, unless there is reasonable cause to believe the employee has committed a crime for which a sentence of imprisonment may be imposed, stating the specific reasons for the proposed action;

(2) a reasonable time, but not less than 7 days, to answer orally and in writing and to furnish affidavits and other documentary evidence in support of the answer;

(3) be represented by an attorney or other representative; and

(4) a written decision and the specific reasons therefor at the earliest practicable date.

In addition, pursuant to section 7513(d) an employee against whom an adverse action is taken is entitled to appeal to the Merit Systems Protection Board under 5 U.S.C. § 7701 (1982).

It is impossible to reconcile this set of procedures with the concept of seasonal employment. The seasonal employee, having agreed to a termination date, does not require thirty days advance written notice.

---

**23.** The NTEU calls upon us to ignore the general rule and review the MSPB's decision more strenuously. It reasons that because the MSPB gave substantial deference to OPM's interpretation of the regulation at issue here, the MSPB abdicated its role as an independent reviewer and diminished the deference it might otherwise expect of a reviewing court. It therefore argues that we should apply the less deferential standard of review articulated in *Atwell v. Merit Systems Protection Bd.*, 670 F.2d 272, 281–82 (D.C.Cir.1981) (while there are circumstances under which courts should defer to an agency's understanding of the statute, when reviewing an agency's attempt to reconcile arguably conflicting statutory provisions, more strenuous review is appropriate since the disputed order or decision involves the construction of the organic statute under which the agency operates).

The government argues in reply that the MSPB accorded the proper degree of deference to the OPM here because of its acknowledged expertise as the agency charged with the administration of the federal personnel system. It also points out that the MSPB reached its decision after a thorough and independent review of the record and that the arbitrary and capricious standard of § 7703(c)(1) is the appropriate standard for judicial review of an administrative adjudication in which, as here, no formal evidentiary hearing is required by statute.

We recognize the danger that the MSPB could abdicate its authority under the CSRA and simply rubberstamp all OPM decisions. We do not think, however, that that danger exists in this case. In reaching its decision the MSPB solicited information on seasonal employment going far beyond what the parties originally filed with the agency. Because its decision was based on independent information and on a detailed examination of the OPM's rationale for its reading of the statute, its legislative history, and the policies behind the CSRA, we are unpersuaded that its decision should be accorded less deference in this case simply because it, in turn, also gave some deference to the OPM's construction of the statute.

He has no response to make and hence no occasion to furnish affidavits and other documentary evidence. An attorney would have nothing to say on his behalf. A written decision, giving reasons, could only consist of the statement that the layoff is in keeping with the agreement. This entire set of procedures—as the reference to the commission of a crime and the right of appeal to the MSPB merely emphasize—is designed for a worker who is being discharged for some sort of misbehavior, not a temporary layoff pursuant to agreement.

Layoffs of seasonals in accordance with the conditions of their employment do not present the fundamental problem addressed by the provisions that create adverse action protections—the defeat of legitimate employee expectations of job retention. In this sense, layoffs of seasonals in accordance with conditions they agreed to when taking the jobs are not "adverse" actions. The policy Congress adopted the adverse action protections to serve thus does not favor application of those protections to seasonals' layoffs. Moreover, whereas the employee-protection policy of the CSRA does not support the coverage of seasonals' layoffs, the complementary management-efficiency policy of the CSRA, as the OPM and MSPB found, strongly supports the exclusion of seasonals' layoffs from coverage. The will of Congress as expressed in the relevant policies thus supports the MSPB's position.

That NTEU's reading of the text of sections 7511 and 7512 is not consistent with the legislative intent is further indicated by the fact that "such interpretation leads to absurd results." 2A C. Sands, *Sutherland Statutory Construction* § 46.07, at 65 (4th ed. 1973). *See also United States v. Bryan*, 339 U.S. 323, 70 S.Ct. 724, 94 L.Ed. 884 (1950); *Lange v. United States*, 443 F.2d 720, 722–23 (D.C.Cir.1971). Thus, NTEU's version of the statute would require thirty days' notice before an agency could demote a tenured employee who had been temporarily promoted and given higher pay merely for the time his supervisor is out sick, even when the supervisor returns to work on less than thirty days' notice.

With respect to layoffs of seasonal employees, this application of sections 7511 and 7512 would require thirty days' notice before, say, the forest service could lay off a forest service employee working "on call" to put out a forest fire. These results are not just absurd in the judgment of the OPM and MSPB; more important, they are absurd when measured against the crucial legislative policy of promoting management efficiency. The absurd implications of such an interpretation are highly probative evidence of a congressional intent contrary to that construction.

It seems clear, in fact, that in sections 7511 and 7512 Congress was not addressing the question of seasonal layoffs at all. Congress might have considered and provided for the problem of seasonals' layoffs in two ways. It might have focussed specifically on the problem and prescribed a rule to address it. Or it might have decided that the rule it laid down was intended to apply to all situations, including those not currently in mind when enacting the statute. Congress did neither.

First, there is no sign of any congressional attention to the distinction between appointments made subject to agreed conditions concerning layoffs and appointments not thus contingent. That distinction is important because the existence of such agreed conditions alters legitimate employee expectations concerning retention of the appointment. In fact, all of the definitions in section 7511 use terms that betray no sign of congressional contemplation of anything but "unconditional" appointments: "grade" is defined as "a level of classification under a position classification system"; "pay" is defined as "the rate of basic pay fixed by law or administrative action for the position held by an employee"; and the two examples given in the definition of "furlough" for nondisciplinary reasons for temporarily placing an employee in nonduty, nonpay status—lack of work or funds—typically result from unexpected, unwarned-of events. The legislative history likewise shows no sign of Congress' having contemplated the distinction between "con-

ditional" and "unconditional" appointments. *See* S.Rep. No. 969, 95th Cong., 2d Sess. 48 (1978); H.R.Rep. No. 1403, 95th Cong., 2d Sess. 7 (1978). The distinction is sufficiently important to the rationale for the provision of adverse action protections that it is unlikely that Congress would have failed to mention it if it had been dealing with conditional employment.

The relevant statutory provisions, sections 7511 and 7512, prescribe a single, simple, general set of rules to govern adverse actions in the civil service system. There is no evidence, either in the statutory language or in the legislative history, that Congress examined the variety of circumstances to which the rules might be argued to apply and designed its rules to take account of the various problems presented by the various circumstances. Indeed, the House Report shows that Congress decided not to think much about such details. *See* H.R.Rep. No. 1403, *supra*, at 7. Statutory language of a very general sort, such as we have here, is less likely to reflect legislative intent in all its details and in all its applications than is statutory language that addresses specific problems in detail. *United States v. Johnson*, 696 F.2d 115, 120 (D.C.Cir.1982); *cf. American Postal Workers Union v. United States Postal Service*, 707 F.2d 548, 562 n. 9 (D.C.Cir. 1983) ("The degree of specificity with which Congress set out the annuity computation formulas in the statute indicate that the administrator's authority to vary the plain meaning of the prescribed formulas is very narrow."), *cert. denied*, —— U.S. ——, 104 S.Ct. 1594, 80 L.Ed.2d 126 (1984).

The legislative history of section 7511 suggests that Congress did not have an intent to override prior practices. With respect to the definitions in section 7511 Congress simply stated: "Definitions (2), (3), (4) and (5) are defined elsewhere in title 5 [of the United States Code] or in civil service regulations or policy issuances and are added for uniformity and clarity." S.Rep. No. 969, *supra*, at 48, U.S.Code Cong. & Admin.News 1978, p. 2770. That explanation is hardly evidence of an intention to do away with well-settled principles.

Moreover, in light of Congress' expressed desire not to undertake a major review and alteration of adverse action rules but rather to codify existing rules and leave analysis and revision for another time and initially for OPM, *see* H.R.Rep. No. 1403, *supra*, at 7, and in light of section 7514's broad grant of regulatory authority to OPM, the statement is best read as reflecting a wish to adopt (with room for future administrative change), not to override (with a rigid statutory rule), existing rules concerning concepts such as "furlough."

Section 7512 similarly does not indicate any congressional insistence on literalism in the application of it and section 7511. Section 7512's five listed exceptions to its application are all limitations on otherwise clear coverage; none is a clarification of an otherwise unclear, disputable application. *See American Federation of Government Employees v. Federal Labor Relations Authority*, 702 F.2d 1183, 1186–87 (D.C. Cir.1983). The list of exceptions thus does not purport to address any problem relating to determining the meaning of sections 7511 and 7512. The existence of the list of section 7512(A)–(E), in short, does not evince any congressional intent to foreclose all questions of the application of adverse action protections to situations that do not present the problems at which those protections are aimed.

This conclusion is further supported by the congressionally expressed desire to adopt existing adverse action practices (with some modifications), putting off a major reevaluation of those practices for another time—a desire indicated not only by the Senate Report's reference to existing rules in explaining the definitions of section 7511, *see* S.Rep. No. 969, *supra*, at 48, but also by the House Report's statement that the CSRA is not "the appropriate vehicle for such change without further study," *see* H.R.Rep. No. 1403, *supra*, at 7. The rules that existed in 1978 provided an exclusion from adverse action protections for layoffs of seasonals in accordance with their conditions of employment, and those rules were continuously in effect from the

time, before 1963, when the federal government began to use seasonal employees. The general intent to codify existing rules thus supports the OPM rule. Further, the Senate Report's reference to existing regulations may have been intended to adopt the existing FPM adverse-action exclusion of seasonals' layoffs. The Senate Report's statement—that the section 7511 definitions "are defined elsewhere in title 5 or in civil service regulations or policy issuances and are added for uniformity and clarity"— could easily be referring not simply to FPM's definition of "furlough" but to the entire set of FPM rules governing furloughs, including those excluding layoffs of seasonal employees. That reading gains support from the fact that the Federal Personnel Manual has at times treated the exclusion of seasonals' layoffs as part of the definition of "furlough." Federal Personnel Manual, ch. 715, § 3–3(d) (Supp. 1963); MSPB Brief at 34.

 In addition, even without the expression of congressional intent not to overhaul existing practices, we would have to pause long before attributing to Congress an intent to alter the long-standing rules governing seasonals' layoffs. As Judge Wald recently pointed out, it has become a "contemporary precept that Congress legislates on the basis of policies and principles it has followed in the past, and unless Congress makes an express statement in the legislative history that it has abandoned longstanding precedent, the court will presume its retention." Wald, *Some Observations on the Use of Legislative History in the 1981 Supreme Court Term*, 68 Iowa L.Rev. 195, 208 (1983) (footnote omitted). Although in this case the rules in effect prior to the statutory enactment were administrative, the policy behind the precept—to avoid the defeat of settled expectations based on legal practice—applies just as if the rules were statutory. That policy has special force in a case such as this, for the MSPB found that agency employment practices might well be upset if the OPM's rule were struck down.

 Finally, we are required to give deference to the findings of both the OPM and the MSPB. What the Supreme Court said about the Federal Election Commission in *FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981), applies to the MSPB and OPM here. The FEC, said the Court,

> is precisely the type of agency to which deference should presumptively be afforded. Congress has vested the Commission with "primary and substantial responsibility for administering and enforcing the Act," ... providing the agency with "extensive rulemaking and adjudicative powers." ... It is authorized to "formulate general policy with respect to the administration of this Act ...."
>
> ....
>
> [T]he task for the Court of Appeals was not to interpret the statute as it thought best but rather the narrower inquiry into whether the Commission's construction was "sufficiently reasonable" to be accepted by a reviewing court.... To satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding.

*Id.* at 37, 39, 102 S.Ct. at 45, 46 (citations omitted). This is certainly true where, as in *Democratic Senatorial Campaign Committee* and here, Congress has left room for interpretation by the agency. As this court recently noted, we are obliged to follow the construction of a statute by the agency charged with its administration if that construction is "reasonably defensible." *Library of Congress v. Federal Labor Relations Authority*, 699 F.2d 1280, 1284–85 (D.C.Cir.1983) (citing and quoting authorities). *See also American Paper Institute v. American Electric Power Service Corp.*, 461 U.S. 402, 103 S.Ct. 1921, 1933, 76 L.Ed.2d 22 (1983).

 OPM and MSPB's findings here are owed the deference represented by that standard of review. Both agencies are

granted broad authority to administer the civil service system. The two agencies agreed on the proper construction of the statute. OPM's rule was a continuation of a long-standing practice that Congress evidenced no intent to change. The rule was promulgated more or less contemporaneously with the statute. The MSPB's conclusion was reached after thorough investigation and consideration. For these reasons, deference is demanded. *See generally National Wildlife Federation v. Gorsuch*, 693 F.2d 156, 166–70 (D.C.Cir.1982) (discussing grounds for deference). The decisions of the OPM and the MSPB, moreover, rest on a distinction, based soundly on the policies of the CSRA, between the layoff of seasonals in accordance with the conditions of their employment and the ordinary "furlough" situation covered by the statutes. The agency conclusions, therefore, are "reasonably defensible."

WALD, Circuit Judge, concurring:

Although the language of the Civil Service Reform Act's adverse action provisions on its face includes layoffs of seasonal or intermittent employees for less than 30 days in accordance with conditions of their contracts,[1] I concur in the opinion of the court excluding them because in most cases, a literal application of these provisions would be futile and wasteful. Where the limiting conditions of seasonal or intermittent employment are external and objectively verifiable, *e.g.*, when an auxiliary forest fire fighter is hired on condition that there are fires for him to fight, a requirement of notice and opportunity to contest a layoff based on the limiting conditions themselves, *e.g.*, that no fires have occurred, would indeed be absurd.

Many seasonal workers, however, are employed subject to being let go at any time for "lack of work," "lack of funds," "weather conditions," "unforeseen circumstances," "ceiling limitations," "fluctuations in workload," and other conditions of a subjective or even manipulable nature that could become a matter of dispute. MSPB Brief at 10, Joint Appendix at 84, 91, 93, 134, 414, 151. In such situations the seasonal or intermittent worker may have legitimate employment expectations that deserve the protection of the adverse action procedures. For example, a seasonal worker might dispute the government's assessment that one of these contractual conditions justifying placing him in a nonduty, nonpay status, *e.g.*, "fluctuation in workload," has been met. If he can show that the layoff conditions of his contract have not been met, or have been invoked only as a pretext to mask other reasons, I interpret the MSPB and OPM's position to be that the employee is entitled to the protections given furloughs by 5 U.S.C. § 7513. *See* 5 C.F.R. § 752.401(c)(9), Brief for Respondent MSPB at 40. From this conclusion, I extrapolate that where an employee claims that he was placed in a nonduty, nonpay status for less than 30 days not in conformity with the conditions of his employment contract, he is likewise entitled to appeal that placement to the MSPB under the adverse action procedures. *See* 5 U.S.C. § 7513(d). My concurrence is specifically predicated on my understanding that this is indeed OPM and MSPB's interpretation of the scope of the statute and implementing regulations.

For a growing body of seasonal or intermittent workers who are hired only on an on-call basis,[2] however, OPM's regulations

1. Congress made the definition of protected employees broad enough to cover seasonal employees—on this there is no dispute. Congress also defined adverse actions to include "furlough," "the placing of an employee in a temporary status without duties and pay because of lack of work or funds or for other disciplinary reasons" for 30 days or less. 5 U.S.C. § 7511(a)(5). Finally, Congress listed in a separate section specific exclusions from the scope of adverse action protections and those exceptions did *not* include

seasonal worker furloughs. 5 U.S.C. § 7512(A)–(E).

2. "On-call employees are hired under competitive career-conditional appointments with a special provision permitting them to be placed in non-pay status and recalled to duty under streamlined procedures as workload dictates." FPM Bulletin, April 18, 1980, Joint Appendix at 100.

do not appear to provide any adverse action protections under 5 U.S.C. § 7513, since by definition every layoff of an on-call employee is in conformity with the on-call condition. On-call provisions thus give the government virtually plenary discretion over the livelihood of such employees, and this discretion could be abused to play favorites among employees in dealing with temporary layoffs.[3] For such on-call employees, it is not so absurd to read the CSRA as providing a mechanism to challenge temporary layoffs as unfair or as abuses of discretion. Nonetheless, Congress did not draw any statutory distinction between on-call and other intermittent or seasonal employees, and this court cannot pencil in that fine line. We are accordingly left to choose between a "plain language" interpretation that makes sense for a small number of situations but is highly inefficient in the majority, and the one adopted here that is generally sensible, but leaves a troublesome gap in protection for the most vulnerable groups of workers. I think probably Congress simply failed to realize the consequences of failing to provide any protections against arbitrary layoffs of on-call employees.[4] For that reason, while I agree that the MSPB decision upholding OPM's regulation should be affirmed, I nourish the hope Congress will revisit the problem and make its precise intent clearer the next time.

3. There are some limited constraints even on the government's discretion to lay off on-call workers temporarily. Employees alleging that their layoffs were undertaken for punitive reasons could, for example, appeal those layoffs as suspensions. *See* 5 U.S.C. §§ 7502, 7503, 7512(2), 7501(2) ("'suspension' means the placing of an employee, for disciplinary reasons, in a temporary status without duties and pay"). And seasonal employees have the right to file a complaint with the office of the Special Counsel of the Merit Systems Protection Board if they believe that a prohibited personnel practice as defined by 5 U.S.C. § 2302(b) has occurred. The Special Counsel is then required to investigate the complaint and is authorized to seek a stay of a prohibited personnel action and/or file for corrective action with the Board. *See* 5 U.S.C. §§ 1206, 1208.

4. Until quite recently on-call workers were a relatively rare phenomena. At the time of the CSRA's passage in 1978, the CSC had just approved the first experimental program using on-call seasonal workers extensively in federal agencies, *see* Letter of CSC Director Ramsey to Chief of the Personnel Division of the Bureau of the Census Bowden, October 27, 1977, Joint Appendix at 144, and use of on-call workers was not authorized as a general practice until 1980. *See* FPM Bulletin, April 18, 1980, Joint Appendix at 100 (authorizing such according to attached guidelines). It is thus likely that Congress simply overlooked potential problems created by "on-call" workers when it passed the CSRA.